369 So.2d 1043 (1979)
Nathan WALKER, Jr., et ux.
v.
UNION OIL MILL, INC., et al.
No. 62994.
Supreme Court of Louisiana.
March 5, 1979.
Rehearing Denied May 4, 1979.
*1044 R. L. Davis, Jr., Theus, Grisham, Davis & Leigh, Monroe, for defendants-respondents.
Jack F. Owens, Jr., Reeves & Owens, Jonesville, for plaintiffs-applicants.
HALL, Justice Ad Hoc.
The parents of a fifteen-year-old boy brought this wrongful death and survival action for the death of their son who became trapped and suffocated in a soybean storage tank owned and operated by the defendants. The district court rendered judgment for plaintiffs and all parties appealed; defendants as to liability and plaintiffs as to quantum. The Court of Appeal reversed, holding plaintiffs failed to prove *1045 negligence on the part of defendants and were not entitled to recover under the doctrines of res ipsa loquitur or attractive nuisance.[1] 360 So.2d 894 (La.App. 3rd Cir. 1978). We granted certiorari to review the court of appeal's conclusion that defendants were not guilty of actionable fault in leaving a fifteen-year-old boy alone and unsupervised on the premises of the storage facility. After review we conclude the judgment of the court of appeal is correct.
Nathan Walker, Jr., and Martha Walker, the decedent's parents, originally brought this action in 1959 against the owner of the storage tanks, Union Oil Mill, Inc., the storage facility operator, Victor Cross d/b/a United Elevator Company, and their liability insurer, Employers Liability Assurance Corporation, Ltd. The case was tried on the merits on June 17, 1960 and then taken under advisement by the trial court.
Martha Walker died in 1962 and on June 16, 1965 her heirs were substituted as parties plaintiff. Immediately thereafter all plaintiffs moved for summary judgment. On June 24, 1965 defendants filed an exception of unauthorized use of summary proceedings directed toward plaintiffs' motion for summary judgment and exceptions of no cause of action and prescription, attacking the substitution of Mrs. Walker's heirs as parties plaintiff. Although these exceptions were set for trial on three separate occasions, the record indicates that no action was taken on them. There was no further activity regarding this matter until September 22, 1977 when the court rendered judgment in favor of Nathan Walker, Jr. in the amount of $1000 and in favor of the heirs of Martha Walker in the amount of $25,000. The judge who presided at the trial had died and a successor judge decided the case.
The facts are as found by the Court of Appeal: [2]
"The tank in which young Nathaniel lost his life is part of a large grain elevator facility which is used for the storage and processing of soybeans and grain in Ferriday, Louisiana. This facility consists of five cylindrical tanks along with several structures and other supporting equipment. Four of these tanks are situated in a line adjacent to a road and are used mostly for the storage of soybeans. A cross conveyor apparatus traverses the tops of these tanks. A ladder affixed to the exterior of one of the tanks allows a person to reach the top of any of the four tanks.
"Tank number 1 in which Nathaniel met his death, measures 19 feet in diameter with a height of 40 feet, 4 inches. Access to the interior of this tank was provided by means of a manhole located in the top of the tank measuring 1 foot, 7 inches in diameter, and also by a small door located in the side of the tank approximately 12 feet above the ground. This side door opens inward, and thus can be opened only when the level of the beans in the tank falls below the level of the door. Otherwise, pressure from the inside makes this door impossible to open. However, entrance by way of the top manhole can be made at any time, regardless of the level of the beans in the tank. A wooden ladder extends from the manhole down into the tank, allowing a person to descend until he is standing on top of the beans. There are no locks to prevent unauthorized persons from entering the tank through either the side or top entrance. There are no warning signs present.
*1046 "Part of the storage process requires a continuing transfer of the beans from one storage tank to another. This is accomplished by allowing the beans to drain out of the tank by means of gravity flow through a six inch line where they are then conveyed elsewhere. However, when the level of the beans drops to a certain point, gravity is no longer sufficient and the beans will cease flowing on their own. A motor is then used to turn a screw in the center of the tank which pulls the remaining beans out. While being emptied, it is necessary for someone to stand by outside of the tank to clear the line should it become clogged with foreign matter.
"There is no danger to a person entering the tank while it contains beans, if the beans are not moving, i. e., if they are not being drained out of the tank. But it is dangerous to enter the tank if the beans are being transferred as they have a tendency to cave in.
"After the level of the beans drops below the side door, it often becomes necessary for someone to enter the tank to rake or knock some of the remaining beans loose with sticks. However, this is only done when the bean level is near the bottom of the tank.
"Nathaniel's older brother, James Henry Lewis, was employed at the grain elevator. The record shows that Nathaniel hung around the grain elevator and sometimes assisted his brother with some of the cleanup work. At trial, Mr. Cross denied that Nathaniel was an employee or that he had ever observed him in the tanks. There is some evidence to the effect that Mr. Cross had on occasion instructed James Henry Lewis to give Nathaniel some money out of his paycheck. This was denied by Mr. Cross, who further testified that Nathaniel had been advised to leave the premises quite often. Nathaniel had been in the tanks with his brother when the latter's duties required him to enter them to rake out the remaining beans when they reached a low level. James Henry Lewis testified that Nathaniel was familiar with the premises and knew how the entire operation worked.
"The record indicates that on the morning of December 18, 1958, tank number 1 was approximately ¾ full. The beans were being transferred out of the tank by means of the gravity flow process described above. James Henry Lewis was on duty that morning. He testified that Nathaniel was there that morning to assist him with some cleaning under the scales.
"Victor Cross' brother, Howard, sometimes assisted in the operation of the grain elevator. He testified that he stopped by soon after 9:00 A.M. He advised Nathaniel to go home and then left the premises.
"Nathaniel left sometime before noon. After a break for lunch, both James Henry Lewis and Nathaniel returned to the grain elevator at about 1:00 P.M. James Henry Lewis testified that he left the premises at about 2:00 P.M. to visit with a cousin. When he left, Nathaniel was around the base of the tanks. When he returned about fifteen or twenty minutes later, he was no longer there. He did not search for Nathaniel, as he thought he had gone home. The next day, Nathaniel's body was recovered from the tank. At that time, the tank was approximately ½ full.
". . . There is no evidence in the record tending to show that the tank in question or its appurtenances were in any way defective in design or construction. We cannot say that a bean storage tank is a dangerous instrumentality per se. . . .
"It is reasonable to conclude that Nathaniel entered the tank by way of the top manhole, as the level of the beans in the tank would prevent access through the side door. However, there is a complete absence of evidence showing how he came to be trapped in the beans themselves. We do not know how or why he came to the inside of the tank. We do not know if Nathaniel lost his balance and fell into the tank while peering inside, or if he voluntarily climbed down into the tank and then somehow became engulfed in the beans. Any attempt on our part to resolve this matter would be based on pure speculation and conjecture."
*1047 Plaintiffs, who are granted a right of action under Civil Code Article 2315 for their son's wrongful death, may recover if they can prove that: defendants had a duty to observe a certain standard of care toward the youth; defendants breached this duty by falling below that standard; defendants' breach of this duty was a causein-fact of the youth's death; and the harm which actually occurred was the sort of harm that defendants' legal duty was designed to prevent. Boyer v. Johnson, 360 So.2d 1164 (La.1978).
Plaintiffs contend defendants had a duty not to knowingly leave a fifteen-year-old alone and in charge of this mechanical grain elevator operation with all of its attendant dangers, including particularly the danger which resulted in the lad's death, and that defendants should be held to the highest degree of care and constant vigilance.
If plaintiffs' contention accurately defines defendants' duty and standard of care owed to the decedent, then liability would follow because there was a breach of duty by leaving him alone on the premises, the breach of duty was a cause-in-fact of the accident which probably would not have happened if he had not been left alone and the harm which occurred was the sort of harm the duty was designed to prevent.
The inquiry in this case, therefore, focuses on the duty and standard of care owed by these defendants to this particular person who was harmed, considering the facts and circumstances of this case. It might be that a breach of a general duty, although a cause-in-fact of the harm, might not impose liability for the harm because the duty was designed to protect some other potential victim. LeJeune v. Allstate Insurance Co., 365 So.2d 471 (La.1978).
In determining an owner's liability under Civil Code Articles 2315 and 2316 the test has been stated to be whether in the management of his property he has acted as a reasonable man in view of the probability of injury to others. Shelton v. Aetna Casualty and Surety Co., 334 So.2d 406 (La.1976). The owner and operator of a facility has the duty of exercising reasonable care for the safety of persons on his premises and the duty of not exposing such persons to unreasonable risks of injury or harm. In determining a particular defendant's duty consideration should be given to the nature of the facility and the dangers presented by it. In considering a defendant's duty to a particular person, consideration should be given to the person's age, maturity, experience, familiarity with the premises and its dangers, and other such factors which might increase or decrease the risk of harm to that person. The duty would be greater to a person of young age and immature judgment. It would be lesser to a person with experience, knowledge and familiarity with the premises.
The storage facilities and operation were not dangerous to persons on or around the premises, even while the beans were being transferred. The facility did not present a multitude of hazards. The only mechanical operation taking place was the conveyance of the beans by an auger conveyer, completely enclosed, from the tank being drained to another tank. The only function of an employee during this process was to loosen the beans by poking a stick up the six-inch drain pipe if they became clogged, a completely harmless task. There was no occasion during this stage of the process to go to the top of the tanks or to enter the manhole at the top of the draining tank. It was only necessary to go into the tank to assist the flow of beans when the level of the beans was below the side door, which it was not when the accident happened. The only demonstrated danger presented by the entire facility and operation was to one who climbed the ladder to the top of the tank and entered the hole at the top of the tank. Considering the physical remoteness of danger, the effort one had to make in order to encounter the danger, and the lack of any necessity for doing so, it cannot be said that the facility and operation was a hazardous or dangerous instrumentality or that it posed an unreasonable risk of harm to persons who were in the vicinity of the facility.
*1048 Nathaniel was fifteen years old and, according to his mother, had the appearance of a grown mantall and stout. He had been hanging around the facility and working there assisting his brother off-and-on for several months or a year. According to his brother, he was entirely familiar with the operation. According to his brother, he had never been on top of the tanks and had never entered the tanks from the top. Nathaniel attended school and there is no evidence to indicate he was other than a normal fifteen-year-old. He was old enough to be aware of and to appreciate the limited dangers of the operation. The evidence does not establish that he was left in charge of the facility during his brother's brief absence or that he was expected to perform any duties connected with the facility during the brother's absence.
Given these facts, the defendants' general duty to exercise reasonable care for the safety of those in and around the premises did not include the duty to exercise constant supervision of the decedent. The conduct of defendants' employee, Nathaniel's brother, in leaving Nathaniel alone on the premises in a position of apparent safety for a period of 15 to 20 minutes was not substandard or blameworthy, nor did it expose Nathaniel to an unreasonable risk of harm. There was no breach of any duty owed to this particular person harmed.
Plaintiffs urge the applicability of the doctrines of res ipsa loquitur and attractive nuisance. We agree with the court of appeal that neither doctrine is applicable in this case. Res ipsa loquitur is merely a rule of circumstantial evidence whereby negligence is inferred on the part of the defendant because the facts indicate such to be the most probable cause of the injury. The real test of applying res ipsa loquitur is: Do the facts of the controversy suggest negligence of the defendant, rather than some other factor, as the most plausible explanation of the accident? Application of the principle is defeated if an inference that the accident was due to a cause other than defendant's negligence could be drawn as reasonably as one that it was due to his negligence. Boudreaux v. American Insurance Company, 262 La. 721, 264 So.2d 621 (1972). Res ipsa loquitur does not apply if there is sufficient direct evidence explaining the occurrence and establishing the details of the negligence charged. King v. King, 253 La. 270, 217 So.2d 395 (1968).
In this case, all of the defendants' actions complained of are established by direct evidence. Only the actions of decedent remain partially a mystery. If the facts concerning his actions suggest anything at all, it is that the accident was caused by decedent's negligence rather than that of defendants.
Regarding attractive nuisance, application of this doctrine necessarily includes a finding that the injured child was too young to understand and avoid the danger. Saxton v. Plum Orchards, 215 La. 378, 40 So.2d 791 (1949); Richards v. Marlow, 347 So.2d 281 (La.App. 2d Cir. 1977). The decedent not only was old enough to perceive the danger but had actual knowledge of the danger because of his familiarity with the operation.
Having concluded on the merits that plaintiffs are not entitled to recover, it is unnecessary to consider issues raised by defendants concerning abandonment of the action by non-prosecution and untimely substitution of parties plaintiff.
The judgment of the court of appeal is affirmed. All costs are assessed to the plaintiffs.
DIXON, J., dissents.
NOTES
[1] One of the judges of the three-judge panel of the court of appeal concurred in the result on the basis that the decedent was presumptively an employee of defendants and his survivors' rights are governed exclusively by the Workmen's Compensation Law. Both sides take the position that the decedent was not an employee and that the Workmen's Compensation Law is not applicable. Although serious arguments to the contrary could be made based on the facts developed at trial, this court accepts the position of the parties that their rights and liabilities should be determined under tort law.
[2] The facts as found by the court of appeal differ significantly from the ultimate factual conclusions made by the trial court from its review of the transcript. Since the trial judge who decided the case was not the same judge who tried the case, the manifest error rule is not applicable. In any event, the court of appeal's findings are accurate and correct.