483 So.2d 634 (1985)
Nolan A. BOOTY and Blanche B. Goebel
v.
KENTWOOD MANOR NURSING HOME, INC.
No. 84 CA 1042.
Court of Appeal of Louisiana, First Circuit.
December 26, 1985.
Rehearing Denied March 5, 1986.
*636 William M. Quin, Kentwood, and David W. Robinson, Baton Rouge, for plaintiffs-appellees.
Paul H. Jantz, Baton Rouge, for defendant-appellant.
Before EDWARDS, LANIER and JOHN S. COVINGTON, JJ.
JOHN S. COVINGTON, Judge.
In this wrongful death and survival action, Nolan A. Booty and Blanche B. Goebel (plaintiffs) and Kentwood Manor Nursing Home, Inc., and its liability insurer Houston General Insurance Company (defendants), appeal a judgment in favor of plaintiffs and against defendants.
The issues on appeal are: 1) whether the trial court's liability determination is manifestly erroneous; 2) whether the trial court erred in allowing an amendment of plaintiffs' petition after the conclusion of trial on the merits; 3) whether prescription bars the wrongful death claim of plaintiffs' deceased mother; 4) whether the trial court erred in its method of computing plaintiffs' portion of survival damages by counting the part of an absent sibling who was not a party to the suit; and 5) whether the award of damages was either so excessive or so inadequate as to constitute an abuse of discretion.
We amend and affirm.
This suit arises from a fall suffered by plaintiffs' father, Archie Lee Booty, on January 18, 1981, on the grounds of Kentwood Manor Nursing Home, Inc. (Kentwood Manor). Mr. Booty fractured his right hip in the fall and was hospitalized for corrective surgery. Afterward, his physical condition deteriorated and he ultimately died on January 31, 1981, of respiratory arrest secondary to pneumonia, complicated by acute renal failure.
Plaintiffs, two of Mr. Booty's three surviving children, filed this wrongful death and survival action against Kentwood Manor *637 on January 4, 1982, individually and as heirs and representatives of the estate of their deceased mother, who died after her husband on October 11, 1981. Plaintiffs alleged that the nursing home breached its duty of care to its patient, Archie Lee Booty, by its failure to adequately supervise and provide for his safety given his mental and physical condition, and that as a direct result thereof, Mr. Booty suffered an accidental injury which led to his death. By supplemental and amending petition, plaintiffs added as defendant Kentwood Manor's liability insurer, Houston General Insurance Company.
Trial on the merits was held October 18, 1983. At the conclusion of the presentation of evidence, the trial judge took the matter under advisement. On November 2, 1983, plaintiffs filed a motion to stay proceedings and sought leave to amend their petition and to implead an absent party, their non-resident sister. After a contradictory hearing, the trial judge granted the motion for a stay, allowed the filing of plaintiffs' second supplemental and amending petition impleading the absent sibling, appointed an attorney to represent her, and ordered her to assert her claims within fifteen (15) days. However, in an answer filed by her appointed attorney, Archie Lee Booty's third surviving child declined the opportunity to participate in the suit initiated by her siblings and specifically waived any rights she might have in the lawsuit.
Defendants answered the second supplemental and amending petition, objecting to the pleading of new claims (an increase in medical and funeral expenses and a claim for wrongful death damages on behalf of plaintiffs' deceased mother) after trial had concluded, and asserted the peremptory exception of prescription as a bar to the additional claims.
The trial court ultimately rendered judgment in favor of the plaintiffs and against defendants, in solido, on alternate theories of negligence and res ipsa loquitur, awarding each plaintiff the total sum of $35,595.03. While the trial judge failed to rule on defendants' exception of prescription, he implicitly denied it by ruling in plaintiffs' favor on the merits. It is from this judgment that all parties appeal.
The record reflects that Kentwood Manor is a compensated nursing home which does not accept patients unless they have been certified by a physician as being incapable of caring for their own needs. Both Archie Lee Booty and his wife, Blanche Dyson Booty, entered Kentwood Manor together in early 1980. It was Mrs. Booty who insisted upon entering the nursing home, due to her blindness and asthmatic condition; however, Mr. Booty decided to accompany her. They stayed together in one room. At the time of his admission, Mr. Booty was ambulatory, but mentally confused and unable to properly care for himself. He suffered from cerebral vascular arteriosclerosis (hardening of the arteries in the brain) and resulting advanced senile dementia. Mr. Booty was a wanderer; he generally slept during the day and walked about the halls at night, sometimes looking for his daughter or wife (who periodically left the nursing home for hospital treatment). Often he would leave or attempt to leave the building and wander about outside on the nursing home grounds. Mr. Booty's confused mental state and habit of wandering were wellknown to the entire nursing home staff. Although Mr. Booty did not like to be restrained and could not tolerate sedation, the staff physician had given standing orders that any patient could be restrained as needed for their self-protection. The evidence reflects that on one or two occasions prior to the accident Mr. Booty had been briefly restrained by the staff.
The nursing home had a total of seven exterior doors to which the patients had easy access; an additional two exterior doors were less accessible. All exterior doors except the front door were connected to a buzzer alarm system with a control panel located at one of the two nurse's stations. The nursing stations (Stations "A" and "B") were centrally located; each supervised two halls apiece. When these *638 exterior doors were closed, they were locked from the outside but could always be opened from the inside. If a door was opened, however, the alarm system would be activated, a light on the control panel, located at Station "B", would flash, indicating which door had been opened, and nursing home personnel would know that a patient had left the building. However, during the day and throughout the evening, these doors remained propped open for the convenience of the staff and the alarm system was accordingly not activated. Only at the beginning of the 11 p.m.-7 a.m. shift were the doors closed and the alarm system activated.
The front door, through which most visitors entered, was directly across the hall from Station "A". It was not connected to the buzzer alarm system. Instead, at 11 p.m. it was locked and could only be opened from inside or outside with a key. Also at 11 p.m., the LPN staffing the nursing station went off duty and Station "A" remained unstaffed until 7 a.m. Mr. and Mrs. Booty's room was near Station "B."
On the night of the accident, Mr. Booty had been returned to the nursing home by his daughter from a visit to the hospital to see his wife. All evening after his return, Mr. Booty walked the halls looking for his wife, and on at least two occasions had to be retrieved from outside the building by an orderly. Several staff employees on duty that evening observed Mr. Booty's confused mental state and his wandering; when asked, he variously stated that he was looking for his wife, was going outside to chop wood, or was fleeing from someone. At approximately 10:15 p.m., or about 10-20 minutes before the accident, one of the nurse's aides assigned to station "A" met Mr. Booty walking from station "B" to "A." She told him to come back but did nothing to restrain him or to return him to his room. She testified in her deposition[1] that at that moment some emergency took place in the back halls supervised by station "B", and that all the staff ran back there, leaving station "A" unattended.
The LPN assigned to station "A", Marion Stewart, testified that about 10-20 minutes prior to Mr. Booty's fall, she was leaving her station to make her final bed check rounds when she met Mr. Booty in the hall walking toward her station. She took him to station "B" and asked an aide to return him to his room.[2] Nurse Stewart continued with her bed check and about 10-15 minutes later heard someone shouting for help. She checked some of the patients' rooms, found nothing out of the ordinary, and finally looked out the front door and noticed Mr. Booty lying at the foot of the entrance-way steps, half-on, half-off the sidewalk leading to the front door. There was no clear evidence from which door Mr. Booty exited the building. Mr. Booty was taken to a hospital, where doctors performed surgery on his fractured right hip, and where he ultimately met his death from surgical complications 12 days later.
On appeal, defendants maintain that plaintiffs failed to prove that the nursing home breached their duty of care to Mr. Booty or that any breach was the cause of his injury and death.
It is true that a nursing home is not the insurer of the safety of its patients. Murphy v. Allstate Insurance Company, 295 So.2d 29 (La.App.2d Cir.1974), writ denied 299 So.2d 787 (La.1974); Milton v. State (Health and Social and Rehabilitation Services Administration), 293 So.2d 645 (La.App. 1st Cir.1974); Nichols v. Green Acres Rest Home, Inc., 245 So.2d 544 (La.App. 3rd Cir.1971). The duty of care owed by a nursing home to its patients is to provide a reasonable standard of care, taking into consideration each patient's known mental and physical condition. Oswald v. Rapides Iberia Management Enterprises, Inc., 452 So.2d 1258 (La.App.2d *639 Cir.1984), writ denied 457 So.2d 14 (La. 1984); Milton, 293 So.2d 645.
In this case, Mr. Booty's confused mental state and habit of wandering about and leaving the nursing home building were well-known to the entire nursing home staff. At ninety years of age, his risk of injury from a fall was great and obvious. A nursing home's duty generally does not include having an attendant follow an ambulatory patient like Mr. Booty around at all times. Robinson v. Gulf Insurance Company, 434 So.2d 487 (La. App. 2d Cir.1983), writ denied 439 So.2d 1075 (La.1983); Tait v. Western World Insurance Company, 220 So.2d 226 (La.App. 3rd Cir.1969), writ denied 222 So.2d 884 (La.1969). However, a nursing home is required to take reasonable steps to prevent injury to ambulatory, but mentally confused and physically fragile, patients.
Here, the nursing home had reasonably responded to the problem by installing an alarm system on their exit doors (which, pursuant to fire regulations, could not be locked from the inside), with the exception of the front door. This system, if properly activated at all times, would enable the nursing home staff to determine immediately when a patient had left the building without authorization (and thus without adequate supervision) and from which door the exit had been made. This system, if functioning at all times, would enable the staff to take immediate steps to find the wandering patient and return him or her to the building.
However, solely for the convenience of its staff, Kentwood Manor kept the exit doors propped open until 11 p.m., thus rendering the alarm system useless. Until that hour, the staff relied solely upon visual monitoring of exit doors and patients (numbering 121 at the time of the accident) to prevent unsupervised wandering outside of the building.
Standards of care as to nursing homes having been established as a matter of case law, negligence is a question of fact to be determined by the trier of fact, be it judge or jury. Oswald, 452 So.2d 1258. Absent a showing of manifest error, as a reviewing court we will not disturb a factual determination of this nature. To find manifest error, the record must support a conclusion that the factual determinations were clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). The factual findings of the trial court are supported by the record and we cannot say that the conclusion of negligence drawn from these findings is legally unfounded. We find no manifest error in the determination by the trial court that the nursing home breached its duty of care to Mr. Booty, and that this breach was the cause[3] of his injury and death. We affirm the judgment rendered below on the basis of the trial court's determination of negligence alone, for we conclude that the doctrine of res ipsa loquitur is not applicable to the case.[4]
Defendants next contend that the trial court erred in allowing plaintiffs to amend their petition, adding new claims, after the conclusion of the trial on the merits. Alternatively, defendants contend that one of these claims had prescribed.
*640 The record reflects that in their original petition, plaintiffs alleged that they brought suit both individually and as heirs and representatives of the estate of their deceased mother. In paragraph 6 of this petition, they alleged:
"As surviving spouse of Archie Lee Booty, his wife, Blanche Dyson Booty, was entitled to recover one-half of the damages due to his suffering and medical expenses and on her death this claim was transmitted to her three children, one of whom is an absentee and the other two being parties plaintiff herein."
In itemizing their damages, plaintiffs sought to recover their individual damages for the wrongful death of their father, plus one-third each of the total damages claimed for the conscious pain and suffering of their father prior to his death (survival action) and the medical and funeral expenses. They sought only $1,000 each in medical and funeral expenses.
At trial on the merits, plaintiffs' counsel attempted to introduce into evidence a hospital bill for $9,756.43 and a funeral bill for $2,028.64, plus evidence of extraneous bills relating to the funeral totalling $135.42. Defense counsel objected on the ground that this was an expansion of the pleadings. Over objection, the trial judge allowed an instanter amendment of the pleadings. After trial was concluded, the trial court allowed plaintiffs to file their second supplemental and amending petition, in which they: 1) increased their claim for medical and funeral expenses to the sum of $12,000; 2) increased the amount sought individually on their wrongful death claims; 3) asserted that their deceased mother was entitled to recover ¼ of the damages awarded on the survival action; 4) sought damages on behalf of their deceased mother for her husband's wrongful death; and 5) sought 1/3 each of their mother's survival and wrongful death claims.
Defendants contend that the original petition mentions only a survival claim in reference to plaintiffs' deceased mother, while the second supplemental and amending petition asserts a wrongful death claim on her behalf. These are two separate and distinct actions, defendants argue, and the wrongful death claim had prescribed. Defendants also complain of the trial court's action in allowing, upon plaintiffs' motion, an instanter amendment during trial increasing the amount of medical and funeral expenses sought by plaintiffs. Plaintiffs argue that the filing of their second supplemental and amending petition relates back to the date of filing of the original petition, under LSA-C.C.P. art. 1153, thus avoiding the bar of prescription, and alternatively argue that evidence as to the damages suffered by Mrs. Booty due to Mr. Booty's wrongful death was presented at trial without objection, thus expanding the pleadings under LSA-C.C.P. art. 1154.
Mr. Booty died January 31, 1981, and the second supplemental and amending petition asserting the wrongful death claim on behalf of Mrs. Booty was not filed until November 2, 1983. As the prescriptive period for a wrongful death claim is one year under LSA-C.C. art. 2315, the claim would on its face appear to have prescribed. However, LSA-C.C.P. art. 1153 provides:
"When the action or defense asserted in the amended petition or answer arises out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of filing of the original pleading."
Under LSA-C.C.P. art. 1151 et seq., a petition may be amended after answer "only by leave of court or by written consent of the adverse party." When there is no written consent of the adverse party, it is within the sound discretion of the trial court to accept or refuse an amendment to a petition after an answer has been filed and the trial judge's ruling in that regard will not be disturbed unless there has been an abuse of that discretion. Carter v. Safeco Insurance Co., 435 So.2d 1076 (La. App. 1st Cir.1983); White v. Cumis Ins. Soc., 415 So.2d 574 (La.App. 3rd Cir.1982), writ denied 420 So.2d 164 (La.1982). Even after trial has been concluded, amendment still lies within the discretion of the trial *641 court. First Nat. Bank v. Higgs, 406 So.2d 673 (La.App.2d Cir.1981); Faslund v. Kendrick, 169 So.2d 276 (La.App. 1st Cir.1964). In this instance, we find no abuse of discretion in the trial court's allowance of an instanter amendment at trial increasing the amount sought by plaintiffs in medical and funeral expenses. The trial judge satisfied himself that defendant's counsel had received notice of the increased claim several days prior to trial and that defendants would not suffer any prejudice by allowing the amendment.
In reference to the wrongful death claim of Mrs. Booty, we find that evidence supporting the claim was submitted at trial without objection from defendants. When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised by the pleadings. Upon motion of any party at any time, even after judgment such amendment of the pleadings as may be necessary to cause them to conform to the evidence may be made. LSA-C.C.P. art. 1154. We accordingly find no error in the trial court's ruling allowing amendment of the pleadings to assert a wrongful death claim on behalf of the deceased Mrs. Booty. Using the criteria set forth in Ray v. Alexandria Mall, 434 So.2d 1083 (La.1983), we further find that the claim relates back to the date of filing of the original petition, under LSA-C.C.P. art. 1153, and is not barred by prescription.
Plaintiffs next contend that the trial court erred in apportioning, the survival damages 25% each to the deceased Mrs. Booty and the three surviving children. They argue that because one of the three children did not participate in the lawsuit, the survival damages should be divided by thirds rather than by fourths.
In Giroir v. South Louisiana Medical Center, 453 So.2d 949 (La.App. 1st Cir. 1984), affirmed and amended in part, reversed in part on other grounds, 475 So.2d 1040 (La.1985), this court stated:
"(W)e know of no authority which states that when only one of the potential claimants is before the court (on a survival action) that his award must be reduced proportionately by the amount that could have been claimed by other parties."
As defendants have cited us no authority either, we thus find merit in plaintiffs' assignment of error on this issue.
Finally, we are called upon to determine whether the trial court abused its much discretion in the wrongful death awards rendered in favor of the plaintiffs. Defendants contend that the $30,000 awarded the deceased Mrs. Booty for the wrongful death of her husband is excessive; plaintiffs argue that the $15,000 awarded each of them individually for Mr. Booty's wrongful death is grossly inadequate.
Before an appellate court may properly disturb a quantum award, the record must clearly reveal that the trier of fact abused his discretion in making the award. The question we must answer is not whether a different award may have been, in our opinion, more appropriate, but whether the trial court's award can be reasonably supported by the record. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Black v. Ebasco Services, Inc., 411 So.2d 1159 (La.App. 1st Cir.1982). After an extensive review of the entire record, we conclude that there has been no such abuse of discretion in this instance.
For the foregoing reasons, the judgment of the trial court is amended to provide for awards as follows:
I. For the wrongful death of Archie Lee Booty:

A. Nolan A. Booty........$15,507.16 (individually)
 $10,169.05 (onethird
 of wrongful
 death claim of Mrs.
 Booty)
B. Blanche G. Goebel.... $15,507.16 (Individually)
 $10,169.05 (onethird
 of wrongful
 death claim of Mrs.
 Booty)

*642 II. For recovery on the survival action:

A. Nolan A. Booty........$13,225.08 (individually
 and one-third portion
 of transmitted
 claim)
B. Blanche G. Goebel ....$13,225.08

III. Total recovery:

A. Nolan A. Booty........$38,901.29
B. Blanche G. Goebel.... $38,901.29

As amended, the judgment below is affirmed. Defendants to pay all costs.
AMENDED, AND AS AMENDED, AFFIRMED.
LANIER, J., dissents and assigns reasons.
LANIER, Judge, dissenting.
The majority opinion is in error because (1) it failed to recognize the trial court erroneously applied the doctrine of res ipsa loquitur and (2) it affirmed the trial court finding of liability when there is no evidence of an essential element of the theory of recovery.

RES IPSA LOQUITUR
As indicated in the majority opinion, the trial court applied the doctrine of res ipsa loquitur to establish the liability of the nursing home. In Walker v. Union Oil Mill, Inc., 369 So.2d 1043, 1048 (La.1979), this doctrine is defined as follows:
Res ipsa loquitur is merely a rule of circumstantial evidence whereby negligence is inferred on the part of the defendant because the facts indicate such to be the most probable cause of the injury. The real test of applying res ipsa loquitur is: Do the facts of the controversy suggest negligence of the defendant, rather than some other factor, as the most plausible explanation of the accident? Application of the principle is defeated if an inference that the accident was due to a cause other than defendant's negligence could be drawn as reasonably as one that it was due to his negligence. Res ipsa loquitur does not apply if there is sufficient direct evidence explaining the occurrence and establishing the details of the negligence charged. (Citation omitted).
See also E. Cleary, McCormick's Handbook of the Law of Evidence, § 342, p. 804 (2nd ed. 1972). Res ipsa loquitur only applies when: (1) the accident would not normally occur in the absence of negligence, (2) there exists an absence of direct evidence to explain the activities leading to the injury, and (3) the accident or injury was caused by an agency or instrumentality within the actual or constructive control of the defendant. Galloway v. Ioppolo, 464 So.2d 386 (La.App. 1st Cir.1985); Congelton v. Baton Rouge General Hospital, 444 So.2d 175 (La.App. 1st Cir.1983).
Unfortunately, old people fall for many reasons. However, the mere fact that an old person falls does not create an inference of negligence under the doctrine of res ipsa loquitur. Tait v. Western World Insurance Company, 220 So.2d 226 (La. App. 3rd Cir.1969), writ denied, 254 La. 137, 222 So.2d 884 (La.1969). Falls by old people occur in the absence of negligence. There is no evidence in this case that an agency or instrumentality of the nursing home caused Mr. Booty to fall. The trial court erroneously applied res ipsa loquitur.

CAUSE OF MR. BOOTY'S FALL
I agree that the nursing home owed a duty of care to Mr. Booty requiring it to properly supervise his activities. I also agree that the nursing home breached this duty of care under the facts of this case. However, there is no evidence in the record to show a causal nexus between this breach of duty and Mr. Booty's fall. Mr. Booty was an ambulatory patient who walked without assistance. There are many reasons why Mr. Booty could have fallen even if he had been under direct observation. How did the lack of direct observation (supervision) of Mr. Booty cause him to fall? The area where he was found was well lighted. There is no evidence of a defect in the premises. If Mr. Booty's fall was caused by a medical problem, such fall could have occurred at any *643 time and anywhere, whether he was supervised or not. This case is remarkably similar to the Tait case, and the result herein should be the same. The burden was on the plaintiffs to prove this element of their theory of recovery by a preponderance of the evidence. Because no causal nexus has been proven between the breach of duty and the fall, the plaintiffs cannot recover.
For the foregoing reasons, I respectfully dissent.

ON APPLICATION FOR REHEARING.
Rehearing Denied.
LANIER, J., dissents from the denial of the rehearing and assigns reasons.
LANIER, Judge, dissenting.

RES IPSA LOQUITUR
The opinion rendered by the majority on December 26, 1985, was a revision of the original report submitted for consideration. My dissenting opinion filed on January 3, 1986, was directed at the original report because my office had not received a copy of the revised report at that time. As indicated in my dissent, I did not feel that the original report properly addressed the res ipsa loquitur issue. A copy of the revised report was subsequently received. The revised report correctly concludes that res ipsa loquitur "is not applicable to the case." This statement is correct. My statement in the original dissent that the majority failed to recognize that the trial court erroneously applied res ipsa loquitur is in error and should be disregarded.

CAUSE IN FACT
The majority has correctly found the following facts were established by the evidence:[1]
The LPN assigned to station "A", Marion Stewart, testified that about 10-20 minutes prior to Mr. Booty's fall, she was leaving her station to make her final bed check rounds when she met Mr. Booty in the hall walking toward her station. She took him to station "B" and asked an aide to return him to his room. Nurse Stewart continued with her bed check and about 10-15 minutes later heard someone shouting for help. She checked some of the patients' rooms, found nothing out of the ordinary, and finally looked out the front door and noticed Mr. Booty lying at the foot of the entrance-way steps, half-on, half-off the sidewalk leading to the front door. There was no clear evidence from which door Mr. Booty exited the building. Mr. Booty was taken to a hospital, where doctors performed surgery on his fractured right hip, and where he ultimately met his death from surgical complications 12 days later. [Emphasis added.] [Footnote deleted.]
The majority has correctly observed that "[a] nursing home's duty generally does not include having an attendant follow an ambulatory patient like Mr. Booty around at all times." The majority then observes that "a nursing home is required to take reasonable steps to prevent injury to ambulatory, but mentally confused and physically fragile, patients." The majority reached the following factual conclusions on review:
We find no manifest error in the determination by the trial court that the nursing home breached its duty of care to Mr. Booty, and that this breach was the cause3 of his injury and death. We affirm the judgment rendered below on the basis of the trial court's determination of negligence alone, for we conclude that the doctrine of res ipsa loquitur is not applicable to the case.4
In footnotes 3 and 4,[2] the majority explains these factual conclusions as follows:
3. In determining liability under negligence theory, the initial question is *644 one of cause-in-fact. A defendant's conduct must be a necessary antecedent of plaintiff's injury but it need not be the sole cause contributing to the injury. If the plaintiff can show that he probably would not have suffered injury absent defendant's conduct, he has carried his burden of proof relative to cause-in-fact. It is clear that defendant's failure to adequately supervise Mr. Booty was a cause-in-fact of his escaping the confines of the nursing home and that he probably would not have suffered injury had defendant not breached its duty in this regard.
4. Res ipsa loquitur is a rule of circumstantial evidence whereby negligence is inferred on the part of the defendant because the facts indicate that such negligence is the most probable cause of the injury. It is not applicable to this case as direct evidence was presented upon which the trial court could have based his conclusion of negligence on the part of defendant. [Underscoring added.] [Citations omitted.]
I agree that the nursing home failed to adequately supervise Mr. Booty visually and Mr. Booty was able to exit the nursing home building undetected because of this neglect (breach of duty). I do not agree the evidence of record shows the breach of duty (failure to supervise) or exiting the building caused Mr. Booty to fall and injure himself. I do not agree that there is direct evidence to show what caused Mr. Booty to fall.
The building blocks of a factual finding are inferences, credibility and weight.[3] When reviewing the facts in a civil matter, an appellate court may not disturb reasonable evaluations of credibility and reasonable inferences of fact of a district court. However, even though an appellate court determines there is a reasonable basis for the factual findings of a trial court, the appellate court has latitude to evaluate the overall weight of the evidence to determine if the factual conclusions of the district court are clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Canter v. Koehring Company, 283 So.2d 716 (La.1973); State in Interest of Cox, 461 So.2d 658 (La.App. 1st Cir.1984), writ denied, 464 So.2d 1375 (La.1985).
Circumstantial evidence is evidence of a fact from which another fact can be reasonably inferred. Valentine v. Kaiser Aluminum & Chemical Corporation, 205 So.2d 757 (La.App. 1st Cir.1967). The distinction between direct and circumstantial evidence is discussed in E. Cleary, McCormick's Handbook of the Law of Evidence, § 185, p. 435 (2nd ed. 1972) as follows:
The characterization of evidence as "direct" or "circumstantial" points to the kind of inference which is sought to be drawn from the evidence to the truth of the proposition for which it is offered. If a witness testifies that he saw A stab B with a knife, and this testimony is offered to prove the stabbing, the inference sought is merely from the fact that the witness made the statement, and the assumption that witnesses are worthy of belief, to the truth of the asserted fact. This is direct evidence. When, however, the evidence is offered also for some further proposition based upon some inference other than merely the inference from assertion to the truth of the fact asserted, then the evidence is circumstantial evidence of this further fact-to-be-inferred. Thus in the case mentioned if the stabbing were proved and the culprit in doubt, testimony that A fled from the scene, offered to show his probable guilt, would be direct evidence of the flight but circumstantial evidence of his murderous act. Similarly, testimony of a witness that he recognized A as one present on the scene would be direct evidence of the facts asserted, but testimony that he saw someone who was disguised and masked, *645 but had a voice and a limp like A's, would be circumstantial evidence that the person seen was A. [Footnotes omitted].
The plaintiffs herein had the burden of proving their factual claims by a preponderance of the direct and/or circumstantial evidence. If circumstantial evidence is relied upon, such evidence, taken as a whole, must exclude every other reasonable hypothesis with a fair amount of certainty. Lacey v. Louisiana Coca-Cola Bottling Company, Ltd., 452 So.2d 162 (La.1984); Rawls v. Morris, 470 So.2d 531 (La.App. 1st Cir.1985); Kincade v. Doll, 472 So.2d 60 (La.App. 4th Cir.1985), writ denied, 477 So.2d 105 (La.1985).
There were no witnesses to Mr. Booty's fall. No deposition was obtained from Mr. Booty before he passed away. There is no direct medical evidence in the record to show what caused Mr. Booty to fall. Thus, clearly there is no direct evidence to show a causal nexus between the breach of duty (failure to visually supervise) and the fall. If the plaintiffs are to meet the burden of proof required of them to show causal nexus, it must be done with circumstantial evidence.
Mr. Booty was found lying partially on the sidewalk at the foot of the entrance steps.[4] No one saw Mr. Booty leave the building. Because there is no direct evidence, we do not know if Mr. Booty fell while descending the entrance steps or if he fell while attempting to return to the building. The record contains no evidence of a defect in the premises that could have caused Mr. Booty to fall. The area was well lighted with two floodlights; the steps had handrails; a ramp exist was located nearby. Because the area where the fall occurred was lighted and vision would be unhampered as in daylight, the time of the fall is not relevant to show a causal nexus. Because there were no proven defects in the premises, the place of the occurrence is not relevant to show a causal nexus. Because Mr. Booty was ambulatory and the nursing home had no duty to have an attendant at his elbow (as conceded by the majority), the fact that such an attendant was not present is not relevant to show a causal nexus.
The plaintiffs had the burden of showing by circumstantial evidence how the failure to have visual supervision of Mr. Booty caused him to fall. Stated another way, does the circumstantial evidence show Mr. Booty would not have fallen had there been visual observation of him at the time of the fall? Could Mr. Booty have fallen in the daytime while he was under visual supervision and in this area? Did the fall occur because Mr. Booty was in a place where he should not have been at a time when he was not supposed to be there, or did he fall for some other reasons? Did the failure to visually supervise Mr. Booty cause him to trip and fall on the steps?
The circumstantial evidence presented by the plaintiffs does not exclude every other reasonable hypothesis explaining the fall with a fair amount of certainty. The direct evidence shows Mr. Booty suffered from cerebral vascular arteriosclerosis (hardening of the arteries in the brain) and resulting advanced senile dementia. His overall condition was described as "generally failing health." It is reasonable to infer from this direct evidence that Mr. Booty's fall was caused by his medical conditions, that the fall could have occurred at any time wherever he was and that visual observation of him would not have prevented the fall. The circumstantial evidence presented by the plaintiffs does not exclude this reasonable hypothesis explaining the fall with a fair amount of certainty. The plaintiffs have failed to satisfy their burden of proof. The trial court factual finding to the contrary is not supported by the overall weight of the evidence and, thus, is clearly wrong.
For the foregoing reasons, I respectfully dissent from the denial of the rehearing.
NOTES
[1] The witness was deceased at time of trial and her testimony was admitted by deposition.
[2] Nurse Stewart also testified that some emergency took place in the back halls about this time, but none of the staff actually assigned to those halls that night could recall such an event.
[3] In determining liability under negligence theory, the initial question is one of cause-in-fact. A defendant's conduct must be a necessary antecedent of plaintiff's injury but it need not be the sole cause contributing to the injury. If the plaintiff can show that he probably would not have suffered injury absent defendant's conduct, he has carried his burden of proof relative to cause-in-fact. Straley v. Calongne Drayage & Storage, Inc., 346 So.2d 171 (La.1977). It is clear that defendant's failure to adequately supervise Mr. Booty was a cause-in-fact of his escaping the confines of the nursing home and that he probably would not have suffered injury had defendant not breached its duty in this regard.
[4] Res ipsa loquitur is a rule of circumstantial evidence whereby negligence is inferred on the part of the defendant because the facts indicate that such negligence is the most probable cause of the injury. Walker v. Union Oil Mill, Inc., 369 So.2d 1043 (La.1979); Galloway v. Ioppolo, 464 So.2d 386 (La.App. 1st Cir.1985). It is not applicable to this case as direct evidence was presented upon which the trial court could have based his conclusion of negligence on the part of defendant.
[1] These facts were established by direct evidence.
[2] These two footnotes were not in the original report. This dissent is partially necessitated by what I perceive to be erroneous statements of fact and law contained therein.
[3] There are no significant credibility determinations in this case. The significant factors herein are inferences and weight.
[4] These facts were established by direct evidence and are not in dispute.