550 So.2d 379 (1989)
Wesley A. FOX, Plaintiff-Appellant,
v.
OUR LADY OF LOURDES REGIONAL MEDICAL CENTER; Optical Radiation Corporation; Barry A. Bohn; Barry A. Bohn, M.D.; Louisiana Medical Mutual Insurance Company; and the State of Louisiana Patient's Compensation Fund, Defendants-Appellees.
No. 88-609.
Court of Appeal of Louisiana, Third Circuit.
October 4, 1989.
Rehearing Denied November 7, 1989.
Writs Denied January 19, 1990.
*381 S. Gerald Simon, Mestayer & Simon, New Iberia, for plaintiff-appellant.
Donald C. Brown, Carmouche & Grey, Lake Charles, Tama Blanchard, Durio, McGoffin, & Stagg, Lafayette, for defendants-appellees.
Before DOMENGEAUX, FORET and KING, JJ.
DOMENGEAUX, Judge.
After undergoing cataract surgery in 1984, plaintiff, Wesley Fox, filed this medical malpractice suit against several defendants: Dr. Barry A. Bohn; Dr. Bohn's medical corporation; Dr. Bohn's malpractice insurer, LAMMICO; Our Lady of Lourdes Regional Medical Center; Optical Radiation Corporation; and the Patient's Compensation Fund for the State of Louisiana. Plaintiff alleged that an improper intraocular lens was implanted in his eye during cataract surgery. As a result, Mr. Fox claims to suffer from impaired vision in his left eye.
Prior to trial, Our Lady of Lourdes, the Patient's Compensation Fund, and Optical Radiation Corporation were dismissed from the suit without opposition from plaintiff. Those parties are not involved in this appeal.
After a bench trial in December 1987, judgment was rendered in favor of the defendants and the plaintiff's suit was dismissed. Plaintiff appeals the trial court's ruling, alleging the following errors:
1. The trial judge erred in finding that Dr. Bohn complied with the accepted standard of care in his treatment of Mr. Fox.
2. The trial court erred in failing to apply the doctrine of res ipsa loquitur.
3. The trial court erred in failing to award damages to Mr. Fox.
We find merit to these assignments of error, and accordingly, we now reverse the trial court's judgment.

FACTS
In August of 1984, plaintiff was examined by Dr. Bohn in preparation for cataract surgery. The upcoming surgery would entail the removal of plaintiff's cataractous lens in his left eye and the implantation of an artificial intraocular lens (IOL). Of particular importance to the success of the procedure are certain measurements of the patient's eye which are taken prior to surgery and upon which a correctly fitting lens is chosen. Dr. Bohn's medical technician took the essential measurements of Fox's left eye during his one office visit before surgery.
Dr. Bohn performed the cataract surgery in September 1984. It was without complication and the left eye healed as expected. Mr. Fox experienced problems with the vision in his left eye, however, and as a result of this Dr. Bohn referred him to Dr. Robert Stewart at the Houston Eye Center.
Dr. Stewart discovered that the IOL implanted by Dr. Bohn was the wrong power and caused poor vision in the left eye. Mr. Fox's left eye would require an IOL power of 33 for adequate vision, not the 25 powered IOL that Dr. Bohn implanted.
The power of an IOL is determined prior to surgery by measuring the curvature and the axial length of a patient's eyes. These measurements are then entered into a computer which calculates the appropriate lens strength. Of course, if incorrect measurements are entered, an inappropriate lens strength will be calculated.
Mr. Fox contends that Dr. Bohn's medical technician did not obtain the correct curvature and axial length measurements of his left eye which resulted in the calculation of the wrong IOL strength. Mr. Fox's eyesight is impaired and he must wear corrective contact lenses. His left eye requires correction of 8.75 diopters while his right eye requires correction of only 1.75 *382 diopters.[1] His prescription for reading glasses, however, has remained unchanged before and after surgery.
Because of the condition of plaintiff's eyes, he contends that he has suffered greatly. He attributes his early retirement to his poor vision. His lost eyesight has caused physical problems as well as mental anguish. As a result, plaintiff has asked for both general damages and lost wages.

LAW
As a plaintiff in a medical malpractice action, Mr. Fox must prove three factors which together characterize a physician's negligence. The plaintiff has the burden of proving the degree of care ordinarily practiced by physicians within the defendant's medical specialty. The plaintiff must also prove that the defendant failed to use reasonable care and diligence along with his best judgment in the application of the skills of his specialty, and that as a proximate result of this lack of skill or care the plaintiff suffered injuries that would not otherwise have been incurred. La.R.S. 9:2794.
Dr. Bohn is a medical doctor whose specialty is ophthalmology. Specialists are required to exercise the degree of care and to possess the degree of knowledge or skill ordinarily exercised and possessed by physicians within their medical specialty. In order to prove the negligence of a specialist, only those qualified in that specialty may offer evidence of the applicable standards. Felice v. Valleylab, Inc., 520 So.2d 920, 928 (La.App. 3rd Cir.1987). After a careful review of the conduct of the defendant physician, a determination must be made as to whether the standards of the specialty were breached.
The doctrine of res ipsa loquitur comes into play in a medical malpractice action when direct evidence is insufficient to explain the plaintiff's injury. The Louisiana Supreme Court recently explained the operation of this principle in Montgomery v. Opelousas General Hospital, 540 So.2d 312 (La.1989), a medical malpractice case:
The principle of res ipsa loquitur is a rule of circumstantial evidence that infers negligence on the part of defendants because the facts of the case indicate that the negligence of the defendant is the probable cause of the accident, in the absence of other equally probable explanations offered by credible witnesses. Boudreaux v. American Insurance Co., 262 La. 721, 763-64, 264 So.2d 621, 636 (1972). The doctrine allows an inference of negligence to arise from the common experience of the factfinder that such accidents normally do not occur in the absence of negligence.
Additionally, the doctrine does not dispense with the rule that negligence must be proved. It simply gives the plaintiff the right to place on the scales, "along with proof of the accident and enough of the attending circumstances to invoke the rule, an inference of negligence" sufficient to shift the burden of proof. Id.; Larkin v. State Farm Mutual Automobile Insurance Co., 233 La. 544, 551, 97 So.2d 389, 391 (1957).
The doctrine applies only when the facts of the controversy "suggest negligence of the defendant, rather than some other factor, as the most plausible explanation of the accident. Application of the principle is defeated if an inference that the accident was due to a cause other than the defendant's negligence could be drawn as reasonably as one that it was due to his negligence." Walker v. Union Oil Mill, Inc., 369 So.2d 1043, 1048 (La.1979); Boudreaux, [supra]. The doctrine does not apply if direct evidence sufficiently explains the injury. Walker, [supra]; King v. King, 253 La. 270, 278, 217 So.2d 395, 397 (1968).
540 So.2d 312, 319.

EVIDENCE
There is no dispute among the parties to this suit that Mr. Fox's vision problems *383 are attributable to the insufficiently powered IOL implanted in his left eye by Dr. Bohn. The question is whether a mistake or miscalculation of this type will occur in the absence of negligence. To make this determination we must first review the evidence of an ophthalmologist's standard of care in cataract surgery.
To determine the appropriate refractive power of an IOL for a particular patient, the physician takes certain measurements of the affected eye.[2] The axial length or depth of the eye is recorded in millimeters, and the curvature of the eye is expressed in diopters. The latter is called the "K reading." The measurements are entered into a computer which calculates the appropriate refractive power for the IOL.
Axial length measurements are taken with an ultrasound device. A probe is applied to the surface of the eye and readings are produced through ultrasound. If the probe is not correctly applied, the ultrasound may produce inaccurate readings. The procedure is a delicate one and can be performed correctly only with training and skill.
Dr. Bohn's staff used a common acceptable machine for taking the axial length measurement. The machine is called the Jed Med Axisonic II and was in good working order at the time of Mr. Fox's measurements. While the testimony indicates that the axial length measurements obtained by Dr. Bohn's staff were off, the record is void of any evidence that the Jed Med Axisonic II caused the inaccurate readings. Rather, the expert and factual testimony reveals that the measurements could have been taken improperly through human error.
Furthermore, the measurement of the left eye axial length was not checked or compared with a measurement of the right eye axial length. This comparison is a common practice among ophthalmologists and was suggested in the instruction manual for the Jed Med Axisonic II. Even the defendant's expert admitted that it is a common practice among those "more expert" than he, although he does not believe it is "totally necessary" to measure both eyes.
The axial length measurement obtained by Dr. Bohn's staff was inconsistent with that obtained by the physicians at the Houston Eye Center. It is clear that the wrong measurements will lead to the calculation of an incorrectly powered IOL. Indeed, the expert testimony of Dr. Jack Holladay, an eminent scholar and practitioner in this field, reveals that the inaccurate axial length measurements of Dr. Bohn's office contributed in part to the implantation of the wrong powered lens in Mr. Fox's left eye.[3]
In addition to the likelihood of human error and the absence of a comparison check with the right eye, the expert testimony reveals a third problem with Dr. Bohn's axial length measurement. The proper technique was to take a series of measurements and then average them for use in the IOL formula. Dr. Bohn did not average the figures he obtained, but chose the longest measurement. Given the expert testimony concerning the state of this technique in 1984, we do not believe that this choice alone constituted a breach of the standard of care.
*384 The evidence reveals that Dr. Bohn's staff not only obtained inaccurate axial length measurements, but also obtained incorrect K readings. The flaw in the K readings was caused by the failure to instruct Fox to remove his hard contact lenses sufficiently prior to his preoperative visit. This was a breach of the standard of care and directly contributed to the incorrect K readings obtained on Fox's left eye.
The standard of care which must be followed by an ophthalmologist in anticipation of cataract surgery includes the duty to properly prepare the patient for preoperative care. Mr. Fox was a long time contact lens wearer. He had been wearing hard contact lenses for approximately thirty years. All the experts agreed that hard contact lenses can distort the curvature of the eye and cause inaccurate K readings.
To prevent this problem, cataract patients are instructed to remove their contact lenses prior to coming in for preoperative measurements. The eyes will then be able to return to their original shape. Although the physicians who testified disagreed as to how much time is required for the eyes to adjust (between two hours and two weeks), it is evident that Mr. Fox was not instructed to take his contact lenses out until he arrived at Dr. Bohn's office for his preoperative examination and eye measurements. The K readings were taken shortly after Fox removed his lenses in Dr. Bohn's office for purposes of the examination.
Ultimately, Dr. Bohn implanted a 25 diopter IOL in Fox's left eye instead of a 33 diopter IOL which would have given him adequate vision. The record discloses, and we have discussed, three causes for this error: (1) the inaccurate axial length measurement which resulted from human error, (2) Dr. Bohn's failure to take comparison measurements of the right eye, and (3) the inaccurate K reading which resulted from Dr. Bohn's failure to instruct Fox to remove his hard contact lenses sufficiently prior to preoperative measurements of the curvature of the eye. These three factors contributed to the error in lens power choice. The record does not, however, specify the extent to which the three factors contributed to the error; the doctors merely assigned a percentage of the total error to each factor. Furthermore, the estimates varied among the doctors.
While it is true that a physician is not an insurer or guarantor of the results of his treatment, it is equally true that a physician must use reasonable care and diligence, along with his best judgment in the application of the skills of his specialty. The record herein indicates that the defendant did not use the care and diligence required in the practice of his specialty. This constitutes negligence. We have been presented with no probable explanation, other than the defendant's negligence, as to the cause of Mr. Fox's vision problem.
The record does not suggest that Mr. Fox caused or contributed in any way to his condition. Nor is there any suggestion that the measuring devices used by Dr. Bohn's staff were not working properly. There is no indication that the IOL was deficient in any way. Finally, there is no proof that the formula used to calculate the proper IOL power was insufficient.
What we are left with is proof that Dr. Bohn failed to comply with the standard of care for his specialty in three crucial ways. We know that a fourth problem, an inaccurate measurement of the anterior chamber depth, is evident from Dr. Bohn's office records. We know that subsequent to Fox's preoperative visit, but prior to surgery, Dr. Bohn changed his mind as to the appropriate IOL strength for Mr. Fox; for unexplained reasons, Dr. Bohn changed the hospital IOL order from a 27 IOL to a 25 IOL. We know that other physicians were able to determine the appropriate IOL strength for Mr. Fox.
Given these facts, the doctrine of res ipsa loquitur requires a conclusion that the negligence of the defendant was in fact the probable cause of Fox's current vision problem.

DAMAGES
As a result of the defendant's negligence, plaintiff has suffered damages. His vision in the left eye is 20/400, but it can be *385 corrected with contact lenses. He wears contact lenses daily and uses reading glasses.
The discrepancy between Mr. Fox's vision in the right eye and his vision in the left eye is great and causes problems. Mr. Fox testified that he has some trouble watching movies in a big screen theatre, he is not able to read for long periods, and he can play golf only with assistance so that his golf balls can be located. Mr. Fox is entitled to general damages as a result of the malpractice committed against him.
We do not believe, however, that Mr. Fox is entitled to lost wages. Mr. Fox was employed as a sales representative for AMF Tuboscope and had been with the company forty years. His sales presentations required reading and reference to charts, graphs, and various manuals. The testimony of Fox's superiors at AMF Tuboscope reveals that Fox took advantage of early retirement when it was offered to him in May, 1985.
While Fox contends that he chose to retire because of his eye problems, we have not found sufficient proof of this item of damages. Fox's prescription for reading glasses remained the same before and after the cataract surgery. No medical evidence was offered to prove that Fox's ability to read on the job has diminished. Fox's superiors were essentially unaware of any problems he may have had while reading at work. Therefore, Fox is not entitled to any damages for lost wages.
When increasing or decreasing a damage award, a reviewing court is governed by the standard set out in Coco v. Winston Industries, 341 So.2d 332 (La. 1977), and its progeny, which is so well known in the jurisprudence that it need not be repeated. Here, however, in as much as no award was made in the trial court, the reviewing court may make an award which is just and fair for the damages revealed by the record. Lee v. Great Southwest Fire Ins. Co., 493 So.2d 789 (La.App. 2nd Cir.1986); Wall v. American Employers Ins. Co., 377 So.2d 369 (La.App. 2nd Cir. 1979), aff'd 386 So.2d 79 (La.1980).
We have reviewed the record in detail and conclude that Fifty Thousand ($50,000.00) Dollars is a fair and reasonable award for general damages. Considering the nature, extent, and permanence of Fox's condition, we reach this figure after reviewing the pertinent jurisprudence concerning eye injuries.
Accordingly, the judgment of the trial court dismissing plaintiff's suit at his cost is reversed, and judgment is rendered in favor of Wesley Fox and against the defendants, Barry A. Bohn, Barry A. Bohn, M.D., and the Louisiana Medical Mutual Insurance Company for the sum of Fifty Thousand ($50,000.00) Dollars, with legal interest thereon from the date of judicial demand, until paid.
All costs of these proceedings are assessed against the defendants.
REVERSED AND RENDERED.
NOTES
[1] Dr. Stewart performed cataract surgery on Mr. Fox's right eye in November of 1984 and implanted an IOL with a power of 30.
[2] The axial length and curvature readings are discussed throughout this opinion. One expert, Dr. Holladay, discussed the inaccuracy of Dr. Bohn's anterior chamber depth measurement and estimated that it contributed to Fox's vision problems by a substantial percentage. The record is void of any evidence as to the cause of this mistake and it is not discussed in brief.
[3] The inaccurate measurements are separate and distinct from the discussions throughout the trial court proceedings concerning the formula which was used in 1984 to calculate the proper IOL strength. Regardless of whether that formula was appropriate for Fox's peculiar eye shape, the fact of the matter is that the wrong measurements were plugged into the formula, which necessarily led to an incorrect result.

Dr. Stewart was able to obtain the appropriate lens strength from the right eye using a similar formula. Further, Dr. Stewart's measurements were plugged into Dr. Bohn's formula and the appropriate IOL strength was calculated. This indicates that the formula is not at the root of Fox's problem.