529 So.2d 52 (1988)
Jackie MONTGOMERY, et ux., Plaintiffs-Appellees,
v.
OPELOUSAS GENERAL HOSPITAL, et al., Defendants-Appellants.
No. 87-492.
Court of Appeal of Louisiana, Third Circuit.
June 22, 1988.
Writ Granted October 28, 1988.
*53 Kermit A. Doucet, Lafayette, for plaintiffs-appellees.
Watson, Blanche, Wilson & Posner, Debra Templet, Katherine Gilmore, Ambrose Ramsey, III, S. Alfred Adams, Baton Rouge, for defendants-appellants.
Before GUIDRY, FORET and LABORDE, JJ.
GUIDRY, Judge.
In February, 1984, Mrs. Jackie Montgomery was hospitalized at the Opelousas General Hospital for gallbladder surgery. Following surgery and pursuant to her treating physician's orders, blood was obtained for the purpose of performing various laboratory tests. The plaintiffs contend that Robert Sullivan, the hospital's medical technician, performed the venipuncture in such a way as to cause injury to the median nerve of Mrs. Montgomery's right arm. Pursuant to La.R.S. 40:1299.41, a medical review panel was formed. This panel rendered an expert opinion that the evidence did not support the conclusion that the medical technician failed to meet the applicable standard of care as charged in the complaint. This suit was then filed by Mr. and Mrs. Montgomery to recover damages from the hospital and its technician.
Following a bifurcated trial, a jury found Robert Sullivan liable for Mrs. Montgomery's injuries, and awarded her $200,000.00 in general damages, $5,000.00 in medical expenses, and her husband, $8,000.00 for loss of consortium. The trial judge found the hospital, a state agency, vicariously liable and made the same damage award to plaintiffs as did the jury. This appeal followed. Defendants are joined in their appeal by the Louisiana Patient's Compensation Fund, represented by the Louisiana Commissioner of Insurance.
Defendants-appellants seek reversal of the trial court's judgment on the basis of the following alleged errors:
1. The finding of fact by the trial judge and jury that Robert Sullivan breached the applicable standard of care in performing the venipuncture was clearly in error.
2. The trial court's charge to the jury regarding the applicable standard of care to be followed by a laboratory technician was manifestly in error.
3. The trial court erred in charging the jury on the doctrine of res ipsa loquitur.
4. The award of $200,000.00 in general damages is clearly excessive.
For the reasons which follow, we find merit in assignments of error 1 and 3 which, we conclude, warrants a reversal of the trial court's judgment.
In their petition, plaintiffs made the following allegations:
"...

-3-
... that defendant BOBBY SULLIVAN who was an employee of OPELOUSAS GENERAL HOSPITAL attempted to do a venapuncture [sic] on her right arm, said venapuncture [sic] was unsuccessful and traumatized the median nerve of plaintiff JACKIE MONTGOMERY'S right arm.

*54 -4-
... that the mishandling of the needle and other appurtent apparatus used in the venapuncture [sic] and subsequent withdrawal of the blood for the aforementioned blood test resulted in severe trauma and injury to her right arm causing a lacertus fibrosus syndrome involving the median nerve and/or pronator syndrome in her right arm.

. . . . .

-7-
... that the mishandling of the venapuncture [sic] and the subsequent damage to median nerve in her right arm ... resulted solely from the negligence of defendant BOBBY SULLIVAN, OPELOUSAS GENERAL HOSPITAL and LOUISIANA ASSOCIATION OF HOSPITAL TRUST FUND in the following respects but not in limitation thereof, to-wit:
A) Failing to exercise reasonable care and professional standards during the course of performing a venapuncture [sic] on plaintiff JACKIE MONTGOMERY'S arm during her hospitalization of February 10, 1984.
B) Failing to exercise reasonable care and observation as well as professional standards in the performing of a venapuncture [sic] in making numerous sticks, in wiggling the needle around in plaintiff's arm after making an insertion of the needle, in putting the needle in the median nerve area and/or into the median nerve causing traumatorization of that area of plaintiff's right arm.
C) Failing to have trained, competent personnel to administer and/or perform venapuncture [sic] on patients who are undergoing blood tests such as that performed on petitioner on or about February 10, 1984.
D) Damaging the nerves in petitioner's arms when attempting to perform a venapuncture [sic] in order to perform a blood sample.
E) Other acts of negligence which will be shown at the trial."
At trial, Mrs. Montgomery testified that following surgery, she was returned to her room "near lunch time"; between 2:00 and 3:00 p.m. she was administered "a morphine shot" for pain; and, at approximately 4:00 p.m. defendant, Sullivan, attempted to draw a sample of plaintiff's blood from her right arm. According to Mrs. Montgomery, she "cringed and complained" whereupon Sullivan abandoned his initially chosen site and proceeded to obtain the needed blood sample from a different location. This recollection at trial is strikingly in contrast with statements by Mrs. Montgomery in her deposition some five months earlier, wherein she stated that, when she came out of surgery, she didn't know what time it was other than that it was the same day and that she didn't become coherent until sometime that evening.
Mr. Montgomery testified that he was in the room at the time of the venipuncture. He corroborated his wife's testimony that she cringed and complained and that it took Sullivan two attempts to obtain the blood sample. However, the record evidence reflects that neither of these events are remarkable or unusual.
Mrs. Montgomery testified further that, following the venipuncture and while still hospitalized, she complained of arm pain to two nurses and her physician, Dr. Glenn Granger. Neither nurse recalled any such complaint. The nursing notes in the hospital record reflect no notation of any such complaint and the doctor's discharge summary states that the patient had an "uneventful post-operative course". Dr. Granger's first record of any complaint by Mrs. Montgomery regarding any arm pain is on April 11, 1984, some two months after the surgery. Plaintiff explained that post-operatively she was on various medication for pain and that the arm pain only became significant when the analgesics she was taking decreased in potency and frequency.
At trial three medical experts testified on behalf of plaintiff, Dr. James Domingue, Dr. Ladislas Lazaro III and Dr. Glenn Granger.
Dr. James N. Domingue, a neurologist who testified by deposition, performed *55 EMG's (electromyograms) and nerve conduction studies on Mrs. Montgomery on April 18 and July 17, 1984, the latter examination following surgical release of the lacertus fibrosus by Dr. Ladislas Lazaro III, which we later discuss.[1] The April 18th studies were normal, as were the nerve conduction and EMG studies of July 17, 1984, insofar as relates to the median nerve.
Dr. Domingue's only full examination of Mrs. Montgomery came on November 14, 1984. His opinion regarding her condition was based solely on the history given him by the patient and the results of the EMG's and nerve conduction studies he had performed upon her previously. In his deposition, he opined:
"A. Well, I thoughtMy final impression was that this was a sympathetic dystrophy due to the vena puncture [sic]. I did suggestI had intended to go farther with Mrs. Montgomery; that is, I intended to block the sympathetic nerves, possibly do a test called a thermogram to try to confirm the diagnosis. Mrs. Montgomery was unable or unwilling to continue seeing me. So none of those things got done. But based on the data I have, my final impression was that she had a sympathetic dystrophy due to a median nerve lesion or injury that occurred at the time of the vena puncture [sic].

. . . . .
Q. Okay. Now, Doctor, if a vena puncture [sic] is performed correctly, will there be damage to the median nerve?
A. No.
Q. Doctor, would it be possible to puncture a vein and have the vein seep blood into the pronator teres or the lacertus fibrosis area and compress the median nerve and damage it?
A. I've never seen that. I've never seen it, that I know of. You can seep blood. That's no problem. I think that happens probably a lot. But I've not seen a damaged nerve in that simple a way before." (Emphasis ours).
When asked to explain the meaning of "sympathetic dystrophy", Dr. Domingue responded as follows:
"Unfortunately, it probably has no everyday counterpart. It's aA sympathetic dystrophy is a type of chronic painful disorder one sees after injuries most commonly to the limbsthe arms or legs. The explanation is very poor; that isAnd in fact, I think there are competent physicians around that doubt the existence of this entity. I think most neurologists are familiar with it because we see an awful lot of it. It is called a sympathetic dystrophy because the pain is thought to be a result of an abnormality of what are called the sympathetic nerve fibers, and these are fibers that go to the blood vessels and sweat glands, as opposed to nerves that go to muscles or nerves that provide sensation."
Dr. Ladislas Lazaro III, an orthopedic surgeon specializing in the hands and upper extremities, performed a right lacertus fibrosus release on June 5, 1984. Testifying at trial, Dr. Lazaro stated: "I found the lacertus to be thick ... I released the lacertus... you can then lift it up and ... examine the nerve. The nerve was flattened under there. The nerve is normally... oval ... But it was flattened ... and it was entrapped in scar tissue". Dr. Lazaro surgically freed the nerve from the scar tissue thereby releasing pressure on the nerve. During this procedure, the doctor stated, he picked up the nerve in his hand in order to determine if it had been injured and thus in need of surgical repair. The doctor stated that he both felt the nerve for neuromas (a sign of damage) and visually inspected the nerve under magnification. Neither exam revealed any damage to the median nerve.
When questioned about the etiology of Mrs. Montgomery's scar tissue and her resulting problem, Dr. Lazaro explained:
"... that there were two possibilities to cause the scarthe needlepeople are not supposed to have needles stuck in *56 them,that's what we have to do to get the blood,but because a needle is stuck in you, the body doesn't have to like it,so it does form scar tissue and irritation from a puncture wound, but usually it doesn't give you any trouble.
But, blood in tissues is not supposed to be there, andover a period of time, ... would result in scarification around the nerve as it weremother nature tried to remove it, but mother nature's not perfect, and you get scar tissue. Okay? And then the scar tissue is left. Now,... at that point ... your scar tissue starts to tighten down, ... it gets smaller, and it gets thinner sometimes, and it contracts down. Well that's good, because that's a mechanism whereby scar tissue in the body is minimized, but if that scar is around something, when it tightens up, whatever's in it gets the squeeze. And that's why, I think, that she got worse with passage of time, because this scar tissue was squeezing down, and she was telling me, you know, 'Dock [sic], this is getting worse and worse', and finally, it got real bad. And, uhand then finally we came to surgical management."
Dr. Lazaro went on to state:
"I think the vena puncture [sic] caused the problem, but ... the point that I wish to make is that, just because something goes wrong does not mean thatthat something was done wrong.... I do think that if she had not had the vena puncture [sic], she would not [sic] had the trouble. But II'm notI do not, and I cannot tell you that the vena puncture [sic] was improperly done, so she had the trouble. Because I saw no evidence of trauma to the nerve, with magnification, with palpationthat would lead me to believe that whomever did the vena puncture [sic] was careless with the needle eventor anything of that factI can'tcannot make a statement like that.

. . . . .
I have no probability factors in my minduhas to whether or not the vena puncture [sic] was done improperly. II have talked to many people who have had pains and paresthesia subsequent touhbumping a nerve or hitting a nerve with a needle, but andand it just hurts like the dickens, you know,but that doesn't mean that the vena puncture [sic] was done improperly.

. . . . .
I can only tell you what I found, and I can only tell you that my opinion is that the nerve was not damaged by the needle in my opinion, significantly,and I can tell you that I felt that the vena puncture [sic] set the stage for a lacertus fibrosis [sic] syndrome, ...that brought her to me,and brought her to the operating room ... but I can't tell you this vena puncture [sic] was done improperly."
The record reveals that on the same day as the venipuncture around which this case revolves, plaintiff had an I.V. infiltrate in the same arm, i.e., the intravenous fluids being administered via a needle in a vein began to pool in the tissue surrounding the needle placement site because the needle had either come out of or gone through the vein. Dr. Glynn Granger, Mrs. Montgomery's surgeon for her choleystectomy, stated that during the regular course of hospitalization for gallbladder surgery, a patient's I.V. usually infiltrates from two to five times. Dr. Granger explained that infiltration could be caused by a number of reasons such as the character of the person's veins, patient movement, etc.
On appeal, defendants argue that the trial judge confused and misled the jury by instructing them on the doctrine of res ipsa loquitur. In Royer v. St. Paul Fire & Marine Insurance Company, 502 So.2d 232 (La.App. 3rd Cir.1987), writ denied, 503 So.2d 496 (La.1987), a panel of this court stated:
"Under the doctrine of res ipsa loquitur, a defendant's negligence is inferred because, under the facts presented, the inference that defendant's negligence caused plaintiff's harm is probable and more plausible than any explanation propounded. Morgan v. Willis-Knighton Medical Center, 456 So.2d 650 (La.App. 2nd Cir.1984). The doctrine of res ipsa *57 loquitur is appropriate only if the evidence establishes or suggests that the alleged negligence of the defendant excludes every other reasonable hypothesis as to the cause of plaintiff's condition. Guillory v. Buller, 398 So.2d 43 (La. App. 3rd Cir.1981); Helms v. St. Paul Fire and Marine Insurance, 289 So.2d 288 (La.App. 3rd Cir.1974)."
The Louisiana Supreme Court, in Larkin v. State Farm Mutual Automobile Insurance Company, 233 La. 544, 97 So.2d 389 (1957), explained:
"... It is generally conceded that res ipsa loquitur in no way modifies the rule that negligence will not be presumed. The application of the rule does not, therefore, dispense with the necessity that the plaintiff prove negligence, but is simply a step in the process of such proof, permitting the plaintiff, in a proper case, to place in the scales, along with proof of the accident and enough of the attending circumstances to invoke the rule, an inference of negligence, thereby obtaining an advantage and placing on the defendant the burden of going forward with proof to offset that advantage. When all the evidence is in, the question is still whether the preponderance is with the plaintiff. All that is meant by res ipsa loquitur is "that the circumstances involved in or connected with an accident are of such an unusual character as to justify, in the absence of other evidence bearing on the subject, the inference that the accident was due to the negligence of the one having control of the thing which caused the injury...."
In the present case, Drs. Granger and Lazaro both testified that it was not unusual for a needle to go through a vein either during I.V. therapy or a venipuncture causing some seepage into the surrounding tissue. Neither of these doctors felt that such an occurrence would indicate that the I.V. or the venipuncture was done improperly. Drs. Lazaro and Domingue both stated that it was not unusual for a nerve to be hit by a needle during a venipuncture and such would not necessarily indicate that the venipuncture was done improperly.
The major discrepancy in the medical testimony is between Dr. Domingue's theory of the etiology of plaintiff's injury. Dr. Domingue opined that Sullivan must have done an improper venipuncture, striking and damaging plaintiff's median nerve in the process, which traumatization resulted in sympathetic dystrophy. On the other hand, Dr. Lazaro, who actually viewed plaintiff's median nerve during the lacertus fibrosus release, unequivocally stated that plaintiff's median nerve was not damaged. Rather, Dr. Lazaro was of the opinion that the scar tissue which he found to be compressing Mrs. Montgomery's median nerve was the result of blood seeping into the tissue in the area over a period of time. Further, Dr. Lazaro opined that, although the venipuncture probably caused the seepage of blood, this result did not indicate or establish that the venipuncture was done improperly.
Since Dr. Domingue's opinion was admittedly based on an incomplete evaluation and in as much as Dr. Lazaro not only had the benefit of the results of a number of tests, but actually visually inspected and palpated the allegedly damaged nerve, it was clear error to give greater credence to the medical opinion offered by Dr. Domingue. In fact, Dr. Lazaro's actual inspection of Mrs. Montgomery's median nerve discredits Dr. Domingue's theory of the etiology of plaintiff's injury, i.e., that the nerve was struck and damaged during the venipuncture.
The facts in Congelton v. Baton Rouge General Hospital, 444 So.2d 175 (La.App. 1st Cir.1983), closely parallel the facts in this case. In Congelton, supra, plaintiff complained of pain during a phlebotomy (donating blood), the needle was repositioned and the patient, although continuing to experience some pain, decided to complete the donation. An injury to Mrs. Congelton's left antebrachial cutaneous nerve was thereafter diagnosed. At trial, the court concluded that the doctrine of res ipsa loquitur was applicable and judgment was rendered in favor of the plaintiff. The *58 First Circuit, in reversing the judgment, stated:
"The doctrine of res ipsa loquitur is a rule of circumstantial evidence whereby a defendant's negligence is inferred when the facts indicate that such negligence is the most probable cause of the injury. Walker v. Union Oil Mill, Inc., 369 So.2d 1043 (La.1979). The doctrine of res ipsa loquitur applies when: the accident would not normally occur in the absence of negligence, there exists an absence of direct evidence to explain the activities leading to the injury, and the accident or injury was caused by an agency or instrumentality within the actual or constructive control of the defendant. Sabella v. Baton Rouge General Hospital, 408 So.2d 382 (La.App. 1st Cir.1981).

. . . . .
[A]ll of the medical testimony adduced at trial indicated that plaintiff's injury could have occurred in the absence of negligence. The medical testimony is best reflected by that of Dr. Vance Byars, who served on the medical review panel in this case. He testified that it was standard medical procedure to reposition the needle as Hardesty did when a patient complains of pain and that an injury of this type could happen even with the best medical technique.
We note that the injury suffered by plaintiff was highly unusual and extremely rare. Dr. Byars testified that he has performed over 30,000 venipunctures in his lifetime and has never heard of an injury of this type. Mrs. Bender, who has worked in blood banks for approximately thirty-six years, testified that she has never heard of a nerve being damaged during a phlebotomy. However, the unusual nature of plaintiff's injury does not alone justify the application of res ipsa loquitur, because the great weight of the testimony shows clearly that the negligence of the hospital was not the most plausible explanation of the injury to plaintiff. Broccato v. Leggio, 393 So.2d 183 (La.App. 1st Cir.1980), writ denied, 398 So.2d 530 (La.1981).
Since plaintiff is not entitled to the benefit of the application of the doctrine of res ipsa loquitur, the negligence on the part of the hospital must have been proven by a preponderance of the evidence. This she has failed to do. The evidence clearly establishes that there was no substandard conduct or negligence on the part of the personnel of the hospital in the performance of the phlebotomy. It was very unfortunate that Mrs. Congelton suffered an injury which very rarely occurs to blood donors. But the evidence shows that the hospital discharged its obligation to exercise due care in accordance with recognized standards for this procedure. The hospital, therefore, is not liable to plaintiff under the law."
Congelton, supra, at 176, 177.
As in Congelton, in the case sub judice the medical evidence reflects that plaintiff's injury could have occurred in the absence of negligence. Further, direct evidence was offered on the cause of plaintiff's injury. The only evidence adduced indicating negligence on the part of Sullivan was the opinion offered by Dr. Domingue. His opinion, however, was based upon an incomplete evaluation and the supposition that the medical technician struck and damaged the median nerve at the time the venipuncture was performed. As Dr. Lazaro found no damage to the nerve, there remains no modicum of proof of negligent conduct on the part of defendant, Sullivan. Consequently, since the evidence adduced by the plaintiff neither established nor strongly suggested that the negligence of the defendant was the only reasonable cause of her injury and that such injury could occur even if a venipuncture is properly done, the instruction by the trial judge to the jury on the doctrine of res ipsa loquitur was clear error.
Furthermore, in our opinion, the erroneous "res ipsa" charge played a large part in the jury reaching the conclusion that Robert Sullivan was guilty of negligence which was the proximate cause of plaintiff's injury.

*59 "When a jury is erroneously instructed and the error probably contributed to the verdict, the verdict must be set aside on appeal. Smith v. Travelers Insurance Co., 430 So.2d 55 (La.1983). Then the reviewing court, under its constitutional authority to review facts, should make an independent determination of the facts from the record, if possible, without according any weight whatsoever to the factual findings of the erroneously instructed jury. Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975); Ragas v. Argonaut Insurance Co., 388 So.2d 707 (La.1980)." Footnote omitted).
Picou v. Ferrara, 483 So.2d 915 (La.1986), at 918.
It is well settled that the doctrine of res ipsa loquitur is an evidentiary principle, the applicability of which can only be determined at the conclusion of trial. McCann v. Baton Rouge General Hospital, 276 So. 2d 259 (La.1973). Accordingly, it was necessary for us to review the record in great detail before reaching our conclusion that the jury charge on res ipsa loquitur was improper. That review convinces us that, not only was the complained of charge improperly given, but that plaintiff failed to prove by a preponderance of the evidence that the procedure employed by Sullivan in performing the venipuncture on Mrs. Montgomery fell below the standard of care and professional skill ordinarily employed under similar circumstances by other medical technologists in good standing in the same community or locality or that Sullivan failed to use reasonable care and diligence along with his best judgment in the application of his skill to the procedure.
Therefore, for the reasons stated, the judgment of the trial court is reversed and plaintiffs' demands are dismissed with prejudice. All costs of this appeal are assessed against plaintiffs-appellees.
REVERSED AND RENDERED.
NOTES
[1] The lacertus fibrosus was described by Dr. Lazaro as the tough "gristle" like tissue, which in part of the lower arm covers the median nerve.