540 So.2d 312 (1989)
Jackie MONTGOMERY et ux.
v.
OPELOUSAS GENERAL HOSPITAL et al.
No. 88-C-1909.
Supreme Court of Louisiana.
March 13, 1989.
Rehearing Denied April 20, 1989.
*313 Kermit Doucet, Lafayette, for applicants.
Katherine Long Gilmore, Watson, Blanche, Wilson & Posner, Ambrose K. Ramsey, III, S. Alfred Adams, Carruth, Cooper & Adams, Baton Rouge, for respondents.
DIXON, Chief Justice.
On September 12, 1985, Jackie Montgomery and her husband J.L. Montgomery filed suit against medical technologist Robert Sullivan, Opelousas General Hospital, and the Louisiana Association of Hospitals Trust Fund (the Louisiana Patients' Compensation Fund).[1] The Montgomerys alleged that a venipuncture had been improperly and negligently performed by Robert Sullivan during Mrs. Montgomery's hospitalization in 1984. As a result of this venipuncture, Mrs. Montgomery suffered damage to the median nerve in her right arm.
Following a bifurcated three day trial in October 1986,[2] a twelve person jury unanimously found Robert Sullivan negligent and awarded Jackie Montgomery $200,000.00 in general damages and $5,000.00 in medical expenses. The jury also awarded J.L. Montgomery $8,000.00 for loss of consortium. The trial judge subsequently issued a written opinion also finding Robert Sullivan negligent in performing the venipuncture that injured Mrs. Montgomery and holding Opelousas General Hospital jointly and severally liable with its employee Sullivan under the theory of respondeat superior.
Following denial of post trial motions, the defendants appealed, alleging error in the judge's and jury's factual finding that Sullivan had breached the applicable standard of care in performing the venipuncture and challenging the quantum awarded for general damages and loss of consortium. The defendants also contested the trial court's jury charges on the doctrine of res ipsa loquitur and on the applicable standard of care. The court of appeal agreed *314 with the defendants that the trial court had improperly instructed the jury on res ipsa loquitur and that the Montgomerys had failed to prove that Sullivan fell below the applicable standard of care. Montgomery v. Opelousas General Hospital, 529 So.2d 52 (La.App. 3rd Cir.1988). This court granted writs to determine whether the court of appeal erred in overruling the application of the res ipsa loquitur doctrine in this case. The doctrine of res ipsa loquitur is an evidentiary principle whose applicability cannot be determined absent a detailed review of the trial record. McCann v. Baton Rouge General Hospital, 276 So.2d 259 (La.1973). We now reverse.

FACTS
On the morning of February 17, 1984, Mrs. Jackie Montgomery underwent gallbladder surgery at Opelousas General Hospital. Following the surgery, at approximately 2:00 p.m., Mrs. Montgomery received an injection of morphine for pain. At 4:00 p.m., hospital medical technologist Robert Sullivan drew blood from the antecubital fossa area (the bend in the elbow) of Mrs. Montgomery's right arm in order to perform physician ordered labortory tests. During this venipuncture, Mrs. Montgomery contends that she suffered immediate and excruciating pain. This pain caused her to cry out and to curl her fingers, even though she was under sedation as a result of the morphine given some two hours prior to the venipuncture. According to Mrs. Montgomery, the medical technologist withdrew the needle when she cried out and then "fanned" the needle to find a vein. He was successful on this second attempt. Mr. Montgomery, who was with his wife at this time, testified that Mrs. Montgomery complained of pain and that the technolgist required two attempts to obtain the needed blood sample.
Mrs. Montgomery claims that during the remainder of her five day stay she repeatedly complained of pain and numbness in her arm to the nurses at the hospital and to her treating surgeon. None of her medical records, however, indicate that she complained of pain in her arm during the post operative period.
Mrs. Montgomery remained on medication to relieve her surgical pain after she was released from the hospital until she was discharged by her surgeon, Dr. Glenn Granger, on March 29, 1984. On April 11, 1984, some two weeks after Dr. Granger had discharged her and had discontinued her pain medication, Mrs. Montgomery retured to him with complaints of significant pain in her arm.[3] Dr. Granger referred her to Dr. Ladislas Lazaro III, an orthopedic surgeon who specialized in treating the hands and the upper extremities. Dr. Lazaro then referred Mrs. Montgomery to Dr. James Domingue, a neurologist, who performed nerve conduction studies and an electromyogram (EMG) on April 18, 1984. Both studies produced normal findings.
But despite conservative treatment from Dr. Lazaro, Mrs. Montgomery's pain continued. On the evening of June 4, 1984, the pain became so severe that Mrs. Montgomery went to the hospital emergency room. The next day, Dr. Lazaro performed a right lacertus fibrosus[4] release. Dr. Lazaro stated at trial that he had found the lacertus "thick. All I can tell you isI look at a lot of lacertus and that one's thick. I don't know how to tell you how thick it is so it would become important to you, but it was thick." Under the lacertus was scar tissue that had entrapped and compressed the median nerve, changing it from its normal oval shape to a flat shape.
After Dr. Lazaro surgically released the median nerve from the pressure of the scar tissue, he examined the nerve under magnification. He also picked up the nerve and *315 felt for neuromas, which frequently form when a nerve is injured. Other than the compression of the nerve, Dr. Lazaro found no damage.
Following this surgery, Mrs. Montgomery wore a splint on her right arm, supported by a sling around her neck. Dr. Lazaro testified that his records of June 21, 1984, indicated that Mrs. Montgomery had been relieved of her pain. But on June 28, 1984, Mrs. Montgomery returned to Dr. Lazaro with complaints of a different type of pain. This pain radiated from her shoulder and continued down her upper right arm. Dr. Lazaro suspected that this pain probably resulted from nerve root irritation in her neck and recommended that she see a Dr. Steven Snatic, a neurologist.
Dr. Lazaro next saw Mrs. Montgomery on July 13, 1984, after Dr. Snatic had hospitalized Mrs. Montgomery and conducted a myelogram. The myelogram indicated a "right lateral herniated disk at the C-6, 7 level." Dr. Snatic could not say definitely what caused this herniated disk, only that it was probably caused by "a combination of the normal wear and tear that people have on disk[s], plus probably an accumulation of minor injuries over a period of time." Neither he nor Dr. Lazaro could say whether the sling Mrs. Montgomery wore following the surgery to release the compressed median nerve caused the herniated disk, although neither viewed that as a probability.
During Mrs. Montgomery's hospitalization, Dr. Domingue, at the request of Dr. Snatic, also performed a second nerve conduction study and an EMG. Although the nerve conduction studies remained normal, Dr. Domingue testified that the EMG findings also indicated "involvement of the seventh cervical nerve root from the neck and possibly the eighth cervical nerve root or the first ulnar nerve."
When Dr. Snatic saw Mrs. Montgomery again on September 27, 1984, he testified that his notes indicated that she no longer had neck pain, although she still had "a little discomfort associated with the operation due to the elbow." On November 14, 1984, Dr. Domingue again saw Mrs. Montgomery at Dr. Lazaro's request. Because she was referred to him this time as a patient, not merely for testing, Dr. Domingue testified that he obtained a medical history from her, including a description of the pain in her right arm:
"She told me that physical therapy had eliminated her neck and upper arm pain, but that she was continuing to have problems from the elbow down.... a fluctuating toothache-like sensation ... involving the entirety of the arm below the elbow. She also had some intermittent numbness and tingling in the same area. The pain was much worse when she was exposed to cold or drafts."
After conducting a neurological examination, during which he found no apparent weakness or abnormal reflexes, Dr. Domingue testified that he suspected that her symptoms were "consistent with a sympathetic dystrophy of the right arm."[5] He also testified that he intended to block the sympathetic nerves and possibly confirm *316 the diagnosis by performing a thermogram, but Mrs. Montgomery did not return for treatment.[6]

CAUSATION
The issue in this case is not what caused the injury to Mrs. Montgomery's median nerve. Doctors Granger, Lazaro and Domingue all agreed that the venipuncture caused the damage. Instead, the issue is how the venipuncture caused the damage. According to the testimony of Dr. Domingue, venipunctures in the antecubital fossa area most consistently puncture the basilic vein. Although veins are not uniform in their location in the body, the basilic vein usually lies on top or directly to either side of the median nerve. The nerve itself is approximately one-eighth of an inch below the skin, under the lacertus fibrosus.
Medical technologist Robert Sullivan testified concerning the technique he normally used in performing a venipuncture in the antecubital fossa area. Since he did not remember performing the venipuncture on Mrs. Montgomery, he could not testify to the specific procedure he had used to obtain the blood sample from her.[7] His description of the venipuncture procedure he normally used was consistent with the procedure detailed in medical texts and hospital manuals introducted into evidence. More specifically, Sullivan testified that if he inserted a needle into the vein and did not draw blood, he would withdraw the needle slightly, reposition the angle, and insert it again. This description also was consistent with the description of the proper procedure given by Doctors Domingue and Lazaro. Sullivan did admit that he did not know the location of the median nerve and that to the best of his memory, discussion of the nerve's location or the possibility of its being damaged had not been included in his university training nor in his training at Opelousas General.
Sullivan also testified that he would not have filed an incident report regardless of how much a patient complained during a venipuncture because he felt that making such a report was nurses' duty.[8] A review of the nurses' observations recorded during Mrs. Montgomery's hospitalization, however, reveals no record of complaints of arm pain. Nurse Diane Celestine testified that Mrs. Montgomery did not complain about the pain in her arm during her hospital stay, but that charting of patients' complaints was not always performed contemporaneously with the complaint.
The record shows that the opinions of Doctors Lazaro and Domingue differ concerning the precise cause of Mrs. Montgomery's problem. Dr. Domingue in his deposition indicated his belief that a properly performed venipuncture will not damage the median nerve. Nor did he believe that it was possible for blood to seep from the puncture in the vein and collect under the lacertus fibrosus to the extent required to cause the kind of compression of the median nerve that occurred in this case: "[E]very patient I've ever seen who I thought had a nerve injury due to a vena puncture [sic] told me that they had a lot of pain at the time of the puncture. It wasn't a simple uncomplicated puncture. And then they developed the median nerve dysfunction." Dr. Domingue further testified that blood oozing out of a vein following a venipuncture is under venous (low) rather than arterial (high) pressure. As a result, he does not believe that the pressure is sufficient to cause blood to seep from the *317 vein, collect under the gristle-like lacertus fibrosus, and damage the underlying median nerve. Dr. Domingue agreed that blood trapped for whatever reason under the lacertus fibrosus could contract with age and form a scar that would trap and compress the median nerve. However, the initial pain felt by Mrs. Montgomery was not caused by the scarring. As Dr. Domingue stated:
"[I]f a patient tells you `I had pain immediately and, from that point on, I had pain,' that's not from scarring. I mean the later pain may be due from scarring. But the pain they have for that right away and for the next month is something else, and I don't think it's due to the blood under the lacertus. I think it's due to a puncture of the nerve itself...."
In explaining why Mrs. Montgomery's lacertus fibrosus syndrome produced normal EMG and nerve conduction test results, Dr. Domingue noted that these tests were typically normal in cases of lacertus fibrosus syndrome. Nor would the tests necessarily indicate whether the median nerve itself had been injured:
"[T]he nerve there is composed of maybe fifty thousand (50,000) separate nerve fibers, and it is possible that the nerve injury involves ... only a percentage of them, say five per cent (5%), and that, therefore, you have ninety-five per cent (95%) of the nerves functioning normally and the nerve conductions will look fine to you under those circumstances. However, five per cent (5%) of the fibers is quite enough to produce pain. And if in the end as the mechanism of the sympathetic dystrophy gets established, the fibers that are most concerned with pain are what are called the sympathetic fibers, and they are simply not measurable on any test I know of. They are so small that they are hidden by the larger fibers on the diagnostic testing."
Dr. Domingue also did not find it surprising that Mrs. Montgomery had initially reported that her pain had been relieved following surgery to release the median nerve because the surgeon's manipulation of the nerve actually affects the sympathetic fibers: "[T]he typical history I hear from these kinds of patients are [sic] that after surgery they had a week in which they thought they were better and then it was all back to normalor back to the usual pain syndrome. So I'm not too surprised if they say there is some improvement after surgery."
Dr. Ladislas Lazaro, the orthopedic surgeon who released Mrs. Montgomery's median nerve from the scar tissue that had formed under the lacertus fibrosus, agreed with Dr. Domingue that the venipuncture had caused the scar tissue that ultimately entrapped the median nerve. After noting that the lacertus was quite thick, Dr. Lazaro stated that the scar tissue could have resulted from an external source that had gone into the area of the lacertus and caused the scarring. Unlike Dr. Domingue, however, Dr. Lazaro testified that he believed that a seepage of blood from the venipuncture became trapped under the lacertus fibrosus, hardened, and caused the scar that ultimately trapped the median nerve. While it would be possible for the venipuncture to have been done improperly and caused this problem, Dr. Lazaro stated that it would also be possible for the venipuncture to have been done correctly and still have caused this rare problem.[9]
Testifying further, Dr. Lazaro described his examination of Mrs. Montgomery's median nerve during the surgery to release it from the scar tissue:
"At the time that I did surgery on Mrs. Montgomery, I examined the nerve, and I felt the nerve with my finger. The reason I did that was because I wanted to look at the nerve and to see if there was any evidence of trauma to the nerve. In other words, if the nerve had been gouged,or, if the needle had been placed in the nerve and then wiggled, or something like that, that wouldthat would damage it, then when a nerve is damaged you seeuhwhat we call little *318 neuroma, and then sometimes they're too small to see, but then you can feel them. So I didn't see anything like this. What I saw was a flattened nerve. The the nerve was flattened by pressure what else would make it flat?it should not have been flat,there was pressure there."
Dr. Lazaro also pointed out Mrs. Montgomery's symptoms themselves supported his belief that the nerve had been compressed by seepage from the venipuncture, since her pain increased as time went on. The increase in pain was consistent with the increase in pressure on the nerve as the blood trapped under the lacertus fibrosus contracted. Once the lacertus became irritated and inflamed, it, too, thickened and exerted even more pressure.
Significantly, even though he had examined the median nerve, Dr. Lazaro testified that he did not know whether the nerve had been hit during the venipuncture:
"It was my feeling from the electrical studies that I obtained, which were normal, and from my visual inspection of the nerve, and from my palpation or feeling of the nerve, that the nerve was not damaged by the needle. Now whether the needle hit the nerveI don't know. I don't know who knows.... [T]he only thing I can say is,is what the nerve looked like when I had my opportunity to look at it. I don't know what it looked like before I looked at it."
Dr. Lazaro then noted that nerves are often intentionally hit in order to provide relief from pain, such as the injections most dentists routinely give their patients prior to drilling out and filling a cavity. If, however, the needle were in the nerve and were wiggled, "well, now, that would be bad."
Dr. Lazaro also explained how the seepage of blood from the venous system could have been sufficient to irritate the lacertus fibrosus and cause the formation of scar tissue:
"[T]he veins have a one-way valve system, and if that valve system is competent and able to do its job, when you squeeze a vein, the blood shoots one way. As you move your arm, and work your muscles, those venous components are exposed to increased pressure, because as the muscles get hard, they lie next to the veins, or the veins like next to them, so the veins are compressed and that moves the blood.
And as you go into different positions, when you bend the elbow, the tissues might get slacked, and so it would take a very, very low amount of pressure to scoot blood into that area [the lacertus fibrosus area] ... And then once the blood was in there, if you straighten your arm, the tissues were tight, and then you got a pocket in a tight situation as being squeezed."
Dr. Lazaro mentioned briefly a third possibility that may have caused the scarring under the lacertus fibrosus. When questioned whether a needle being "fanned" could have cut the tissue immediately above the median nerve, Dr. Lazaro noted that this would not cause scarification but could be the source of the bleeding that subsequently did cause the scarring.
Dr. Lazaro also could not say that Mrs. Montgomery would no longer be experiencing pain from the median nerve compression, even though he had surgically relieved the pressure on it, stating that "it would not be unreasonable" for her to still be experiencing pain and that "not everyone we undertake to treat ... gets well." He doubted, however, that her neck problem following the surgery was related to the venipuncture.
As their testimony indicates, neither Dr. Domingue nor Dr. Lazaro can say definitely just how the venipuncture caused the compression of Mrs. Montgomery's median nerve. Dr. Domingue believes that a properly done venipuncture will not cause this problem, while Dr. Lazaro testified that this injury, while rare, can occur as a result of a properly performed venipuncture. Neither could the doctors state positively what caused the nerve to become trapped in scar tissue and flattened. Although Dr. Lazaro actually saw the nerve and found no damage, he did not see the nerve until almost four months after the venipuncture *319 was performed and his testimony indicated he limited his statements concerning the nerve's condition to that time. Dr. Domingue, who did not see the nerve, nevertheless testified that damage to only a few of ther nerve's 50,000+ fibers would be sufficient to cause the pain Mrs. Montgomery experiences. Finally, the doctors disagree concerning whether seepage of blood from a vein as a result of a venipuncture can collect under the lacertus fibrosus and compress the nerve. The testimony of Robert Sullivan sheds little light on how Mrs. Montgomery's injury occurred because he does not remember it.
Thus the record does not show definitively how the venipuncture caused Mrs. Montgomery's injury. The only clear showing in the record is that Mrs. Montgomery's problems did result from the venipuncture.

RES IPSA LOQUITUR
The principle of res ipsa loquitur is a rule of circumstantial evidence that infers negligence on the part of defendants because the facts of the case indicate that the negligence of the defendant is the probable cause of the accident, in the absence of other equally probable explanations offered by credible witnesses. Boudreaux v. American Insurance Co., 262 La. 721, 763-64, 264 So.2d 621, 636 (1972). The doctrine allows an inference of negligence to arise from the common experience of the factfinder that such accidents normally do not occur in the absence of negligence.
Additionally, the doctrine does not dispense with the rule that negligence must be proved. It simply gives the plaintiff the right to place on the scales, "along with proof of the accident and enough of the attending circumstances to invoke the rule, an inference of negligence" sufficient to shift the burden of proof. Id.; Larkin v. State Farm Mutual Automobile Insurance Co., 233 La. 544, 551, 97 So.2d 389, 391 (1957).
The doctrine applies only when the facts of the controversy "suggest negligence of the defendant, rather than some other factor, as the most plausible explanation of the accident. Application of the principle is defeated if an inference that the accident was due to a cause other than defendant's negligence could be drawn as reasonably as one that it was due to his negligence." Walker v. Union Oil Mill, Inc., 369 So.2d 1043, 1048 (La.1979); Boudreaux v. American Insurance Co., 262 La. 721, 765, 264 So.2d 621, 636 (1972). The doctrine does not apply if direct evidence sufficiently explains the injury. Walker v. Union Oil Mill, Inc., supra at 1048; King v. King, 253 La. 270, 278, 217 So.2d 395, 397 (1968).
There is no dispute among the parties in this case that the injury to Mrs. Montgomery's median nerve resulted from the venipuncture. The medical testimony conflicts, however, as to whether an injury of this type occurs in the absence of negligence. Dr. Domingue testified unequivocally that a properly performed venipuncture does not lead to injury of the median nerve. Dr. Lazaro, on the other hand, was of the opinion that the kind of median nerve injury that Mrs. Montgomery suffered could occur from both properly and improperly performed venipunctures.
The doctors also differ in their opinions concerning whether blood under venous pressure can seep from a vein from which blood has been taken and collect under the lacertus fibrosus in such a way as to trap and compress the median nerve. But both doctors also stated that even though a venipuncture was normally a painful procedure, the kind of pain experienced by Mrs. Montgomery during the venipuncture indicated that the needle had hit the median nerve or had "bumped" it. Both doctors did note that merely hitting a nerve was not necessarily a problem, although the failure to withdraw from the nerve or movement of the needle in the nerve could produce problems.
Dr. Lazaro's actual viewing and touching of Mrs. Montgomery's nerve disclosed no damage. Dr. Lazaro did state, however, that even though the nerve showed no damage at the time he was viewing it, he could not say what the condition of the nerve might have been in the months after the *320 venipuncture but prior to the surgery during which he saw the nerve.
The testimony of Robert Sullivan shed little light on how Mrs. Montgomery's injury occurred. Sullivan stated that the plaintiff's veins were easy to find, rating them a "nine" on a scale of one to ten. Nevertheless, Sullivan could not remember drawing blood from Mrs. Montgomery. Nor did he know he could damage the median nerve during a venipuncture.
Both Mrs. Montgomery and her husband gave clear, specific, affirmative testimony concerning the pain Mrs. Montgomery felt when Robert Sullivan performed the venipuncture.[10] The credibility of the Montgomerys is further enhanced by the agreement of all the doctors that Mrs. Montgomery was neither a complainer nor a malinger and tolerated pain well.
The direct evidence offered by the defendants in this case to explain Mrs. Montgomery's injury is not positive evidence. Even though Dr. Lazaro did actually see the condition of Mrs. Montgomery's median nerve and noted no needle damage, he nevertheless could not affirmatively state that the damage to her nerve caused by the pressure exerted by the blood trapped under the lacertus fibrosus was a result of blood seepage from the venipuncture. Dr. Domingue's explanation of the injurythat the needle struck the nervewould appear initially to be discredited by Dr. Lazaro's observation of no needle damage. Dr. Domingue's theory does, however, explain the sudden pain and cramping of her hand that Mrs. Montgomery felt during the venipuncture, while Dr. Lazaro's theory does not.
What is evident from the record is that Mrs. Montgomery had a good, useable, pain-free right arm and hand prior to the performance of this very common medical procedure on February 17, 1984. There is no suggestion that Mrs. Montgomery in any way caused or contributed to her injury. Further, the defendants in control of the procedure are in a superior position to explain the occurrence of the injury. The evidence offered by the defendants, however, is couched in terms of possibilities, descriptions of standard routines normally followed, and complaints not charted according to procedural requirement.
Furthermore, in the bifurcated trial, a unanimous jury and the trial judge found negligence on the part of Robert Sullivan. The trial judge was not mistaken in instructing the jury on res ipsa loquitur.

QUANTUM
The defendants do not challenge the award of medical expenses to the plaintiff, but rather contest the $200,000.00 award to Mrs. Montgomery for general damages, presumably including loss of earnings, and the $8,000.00 award to Mr. Montgomery for loss of consortium. Since the court of appeal dismissed the plaintiffs' suit against the defendants, it did not address the contested damages. It is, therefore, more appropriate to remand the case to that court so that it can decide those issues.

DECREE
Accordingly, the judgment of the court of appeal is reversed, and the case is remanded to that court for further proceedings not inconsistent with this opinion. Costs of this appeal are assessed against defendants.
NOTES
[1] The Montgomerys had previously presented their claim to a medical review panel in accordance with the terms of R.S. 40:1299.41. The panel concluded that the evidence did not support the Montgomerys' contention that Sullivan had breached the applicable standard of care in administering the venipuncture.
[2] Defendant Opelousas General Hospital is an agency of the state. Jury trials against the state are not permitted. R.S. 13:5105.
[3] Dr. Granger stated in his deposition that he asked Mrs. Montgomery why she had not complained of pain previously. Her answer, which he noted as being typical of a post-surgery patient, was that she had had more pain from the gallbladder surgery than from the arm. As the pain from the surgery lessened and the pain medication decreased, she began to notice the arm pain.
[4] Dr. Lazaro described the lacertus fibrosus as a tough gristle-like tissue that covers the median nerve in part of the lower arm.
[5] Dr. Domingue described a sympathetic dystrophy as follows:

"A sympathetic dystrophy is a type of chronic painful disorder one sees after injuries most commonly to the limbsthe arms and legs. The explanation is very poor.... I think there are competent physicians around that doubt the existence of this entity. I think most neurologists are familiar with it because we see an awful lot of it. It is called a sympathetic dystrophy because the pain is thought to be a result of an abnormality of what are called the sympathetic nerve fibers, and these are fibers that go to the blood vessels and sweat glands, as opposed to nerves that go to muscles or nerves that provide sensation.
. . . .
The typical thing is an unrelenting unusual kind of pain. It is usually an unpleasant pain that a patient often has trouble describing. Burning is a common thing they describe. Toothache-like is something they describe, or a painful numbness.... There are other things that may or may not be present with it. The arm may have a temperature difference from the other arm. The arm ... may be different in color ... due to changes in the diameter of the blood vessels in the arm.
. . . .
Nobody has sat down and agreed that one has to have certain things in order to make the diagnosis.... The only thing everybody seems to agree on is you have to have pain."
[6] Based on the data he had at the time, Dr. Domingue testified that he thought Mrs. Montgomery had a sympathetic dystrophy due to a median nerve lesion or injury that occurred at the time of the venipuncture. Dr. Snatic questioned this diagnosis without more information. Dr. Lazaro agreed with Dr. Snatic.
[7] Although Robert Sullivan does not remember performing the venipuncture, the Montgomerys specifically named him in their initial petition as the technologist who performed the procedure. Hospital records indicate only the identity of the technologist who performed the subsequent laboratory tests. Sullivan does not contest the Montgomerys' contention that he performed the venipuncture, only that he does not remember doing so.
[8] The hospital's policies and procedure manual, however, requires that the patient's response to the procedure be charted as part of the documentation of the venipuncture.
[9] While this problem occurs very rarely, Dr. Lazaro believes that it does occur, although he did not state whether he had ever had a patient who did experience this.
[10] Mrs. Montgomery received a shot of morphine some two hours prior to the performance of the venipuncture. According to the medical testimony, morphine is a powerful narcotic whose effect on the body is to dull pain so that it becomes bearable.