| ]•WICKER, Judge.
This appeal arises from a petition for damages filed on behalf of Darryel Picou and Nancy Picou, individually and on behalf of their minor children, Antoine Pierre Picou and Calvin Luke Picou, III (plaintiffs/appellants) against Equifax, Inc. (defendant/appel-lee) alleging an employee of Equifax, Inc. (Equifax) negligently drew blood from Dar-ryel Picou’s (Picou’s) arm causing damages. The trial judge dismissed plaintiffs’ claims. Plaintiffs now appeal. We affirm.
The appellants specify the following error: The trial court erred in failing to invoke the doctrine of res ipsa loquitur. An inference of negligence arose and thereafter the burden should have shifted to Equifax to explain Mr. Pieou’s injury.
On March 10, 1993 Picou had blood drawn at Equifax by Marion Hultberg, a medical technologist. On March 16, 1993 Picou went to the emergency room at Doctor’s Hospital where he was treated by Dr. Ruth Frye-Harper. Dr. Frye-Harper prescribed antibiotics and recommended he follow up treatment with Dr. Joseph Puente, an internist. Dr. Puente treated Picou from March 18, 1993 through March 24, 1993. Dr. Puente referred Picou to an orthopedic specialist. Picou was treated by Dr. Richard L. Meyer, Jr., an orthopedic surgeon, |2from April 20, 1993 until December 28,1994. After reviewing the conflicting testimony of the medical witnesses as to causation and negligence, the trial judge concluded plaintiffs failed to “prove negligence, causation or injury against the defendant by a preponderance of the evidence.” For the reasons which follow, we find no manifest error.
The trial judge heard conflicting medical testimony. Drs. Joseph Puente and Richard L. Meyer, Jr. testified that Picou sustained injuries caused by the venipuncture while Dr. Ruth Frye-Harper found that his condition was not caused by the venipuncture.
Dr. Puente testified he first treated Picou eight days after the incident. He observed a seven-centimeter bruise on Picou’s front right forearm. He noted no redness or tenderness of the elbow. There were no signs of a blood clot. Dr. Puente did observe a three-centimeter area of redness on the inside of the right elbow. There was no abscess, no increased warmth and no tenderness.
Dr. Puente diagnosed Picou as having cel-lulitis, (an infection of the skin and skin tissue) of the right arm on the inside of the elbow. At that time Picou was taking an antibiotic prescribed by Dr. Frye-Harper. Dr. Puente recommended he continue the antibiotic.
Dr. Puente was uncertain which vein was used for the venipuncture and could not determine whether the site of the cellulitis was close to the venipuncture. On the other *221 hand, Dr. Frye-Harper, who had seen him two days prior to his visit with Dr. Puente, testified the area of bruising and the area of the blood draw would have been in the antec-ubital space which is where the veins are located and that Picou’s redness and tenderness were over the medial epicondyle of his elbow. Therefore, unlike Dr. Puente, Dr. Frye-Harper concluded there were two different unrelated processes stemming from two different locations.
Additionally, Dr. Frye-Harper drew up .a complete blood count to determine whether there was the beginning of an infectious process in the red area on the inside of the elbow. His blood count was normal. Since cellulitis is a virulent process, and since emergency room patients tend not to follow up with treatment, she prescribed an antibiotic injection and an oral antibiotic. She never diagnosed him as having cellulitis but only wrote in his chart that cellulitis should be ruled out in the area of the elbow.
| gPicou’s testimony was inconsistent with that of Dr. Frye-Harper’s. He stated the blood count showed an infection.
Dr. Puente, unlike Dr. Frye-Harper, performed no objective tests to determine whether an infection was present. Additionally, he did not clinically observe signs of infection such a fever. Furthermore, he testified that even without a culture, Picou’s picture of symptoms fit cellulitis. Dr. Frye-Harper, however, testified that a physician cannot tell the difference between an inflammatory process and an infection without further testing.
Dr. Puente opined that cellulitis “could be” caused from germs on the skin being introduced into the venipuncture. He also testified that in general, if the venipuncture is sterile, there is no infection.
There was uncontroverted testimony that the venipuncture procedure was sterile. Marion Hultberg, a medical technician with over twenty years experience with venipunc-tures, testified that on March 17, 1993, seven days after the blood draw, she wrote a brief description of the procedure performed on Pieou. At that time the procedure was fresh in her mind. At the time she was only present in that office a few hours a day. She wrote the note at the request of her supervisor, Anne Schott, after Pieou had complained to Schott about his arm. According to Schott, Pieou’s wife called her on March 16, 1993, six days after the procedure, to tell her Pieou had an infection of the arm. Schott spoke with Pieou who told her he had a bruise and a swollen red area near his elbow. Schott testified Pieou came to her office on March 17,1993 to show her his arm.
Hultberg testified the needle and other materials used for the venipuncture were sealed and sterile. The materials come in a lab kit. She also testified that Pieou signed that he witnessed her breaking the seal of the needle. Pieou agreed. Hultberg further testified Picou’s procedure was routine.
Pieou also agreed with Hultberg that the arm area was prepared before the insertion of the needle. Hultberg testified she always prepares the area with a sterile alcohol swab. She cleans both the area for the venipunc-ture and the surrounding area as well. All of the materials used to clean the area are sterile. Although she did not fully detail the procedure she |4used with Pieou in her written note, she explained her routine procedure and stated that Pieou’s venipuncture was routine.
Although Pieou testified that at the time of the procedure he felt intense pain and that Hultberg might have torn a blood vessel, his description of the procedure which was contemporaneously recorded by Dr. Frye-Harper, indicates he did not feel pain at the time of the procedure but only afterward. Dr. Frye-Harper testified she saw no evidence of any hematoma or puncture of the joint space when she examined him. Additionally, despite the pain he described at trial and his inability to perform simple activities such as buttoning clothes without assistance, shortly after the procedure, he nonetheless did not seek medical treatment until six days after the procedure. Although Hultberg did not fully detail the procedure she used with Pi-cou in her written note, she explained her routine procedure and stated that Pieou had a routine venipuncture.
The only discrepancy in the testimony between Hultberg and Pieou was with regard *222 to whether Hultberg had Picou apply cotton to the area afterward or whether she placed a Band-Aid on the area. Although Picou stated she gave him cotton, Hultberg stated that a Band-Aid comes with the kit and that she has never used cotton because it sticks to the blood.
Dr. Puente testified that he wrote a letter to plaintiffs counsel stating that the needle could have been sterile but it was contaminated going through the skin due to poor preparation of the site. However, at trial he testified that since he did not observe the procedure he could not tell what happened. He also stated that a properly done veni-puncture generally does not cause cellulitis.
Dr. Frye-Harper testified that if cellulitis had resulted from the venipuncture, it would have developed from the site of the venipunc-ture and would have been present within hours or a day. Dr. Puente agreed that in general it does not take long for an infection to develop and he would expect an infection to develop from the beginning. Although he testified it would be unusual for there to be no infection at the time Dr. Frye-Harper examined him and be present two days later when he saw Picou, he was unsure about the incidence of a “delayed infection” with a he-matoma. However, he also testified that when he saw Picou on the 18th he saw no signs of a hematoma, which is blood underneath the skin. Additionally, he stated he saw ajjjbruise in the area of the venipuncture and redness over the upper medial epicon-dyle, the same two areas described by Dr. Frye-Harper.
Dr. Frye-Harper’s report the day of her examination indicates she wrote Picou had a resolving right antecubital hematoma. However, at trial she explained that Picou’s description of his arm following the procedure gave no distinct description of a localized hematoma. On the 16th she stated he did not have a large localized hematoma as a result of blood drawing. Instead, he had some bruising which was a normal sequela of the blood draw.
Dr. Puente testified Picou’s cellulitis had resolved on March 24, 1993. He also stated the bruised area was much improved by that date. He recommended Picou continue the antibiotics and return if there were any problems. Picou called his office on April 6, 1993 complaining of pain in his elbow. Dr. Puente was concerned about an infection in this area. He recommended Picou see an orthopedic specialist.
Picou saw Dr. Meyer on April 20, 1993. Dr. Meyer, an orthopedic surgeon, testified Picou gave a history consistent with cellulitis or infection about the elbow. Picou complained of pain but there was no evidence of any residual infection. On examination he noted “tenderness or pain over the tensor aspect of the elbow over the tensor muscle mass which attaches to the lateral side of the elbow.” He felt Picou had lateral epicondyli-tis, which is similar to tennis elbow. He prescribed anti-inflammatory medication and exercises. Picou improved. When he next saw Picou on May 18, 1993 most of his symptoms were in the right shoulder. He stated that Picou’s problems with his right shoulder were not related to the venipunc-ture although it was not unusual for someone with a problem in the hand or elbow to have problems with the shoulder. However, it was “possible” this was related.
He felt cellulitis and epicondylitis were “definitely related” to the venipuncture from the history. Nevertheless, he testified that the risk of infection is always present in a venipuncture. He suggested that unusual skin flora could be a factor in infection.
Dr. Meyer testified the only information he had as to the possibility of an infection from the venipuncture was from the history. He would also defer to Dr. Frye-Harper as to what she saw and as to why she treated him in the manner she did. He is not an emergency room physician and he had no evidence there was an infection. He last saw Picou on | (¡December 28, 1994. He had no lateral epi-condylitis at the time. His problem was in the shoulder.
Dr. Frye-Harper explained she:
would have expected within twenty-four hours that the area of the venipuncture would have become red and warm and tender and that the process would have spread like all cellulitic processes do with *223 out jumping sites and localizing itself to the medial epicondyle.
She stated the only condition related to the venipuncture was the bruising. Bruises can occur without negligence. She also explained that the second condition:
... an inflammatory condition especially a medial epicondylitis -will usually result de nova with no other history as a result of using a joint ... a moderate amount, a large amount ... some people will develop epicondylitis and other inflammatory conditions as a result of frequent use of a joint, or a tendon, or a connective tissue structure.
At the time of the incident Picou was employed by Electrolux. He described his duties as including carrying and pushing 27-pound vacuum cleaners.
Appellants argue that since neither Dr. Meyer nor Dr. Puente could say with certainty whether an unsterile needle or poor site preparation caused the cellulitis, then either of these two possibilities shows Equi-fax was negligent. However, Dr. Frye-Harper gave direct testimony that Picou did not have cellulitis as a result of the venipuncture.
Further, appellants argue that since Hult-berg could not remember the procedure at the time of trial, there was no explanation of what occurred. We disagree. Hultberg wrote a succinct description of the procedure seven days afterwards. She testified that when she did so the event was fresh in her mind. She described the procedure as routine and gave the court a detailed account of her routine procedure.
Additionally, although counsel argues Dr. Frye-Harper changed her mind at trial regarding her diagnosis, we note that she never diagnosed Picou on her record as having cellulitis at the time of the examination.
Appellants assert that the case of Montgomery v. Opelousas General Hospital, 540 So.2d 312 (La.1989) is directly on point. We disagree. Montgomery is a case involving a negligently performed venipuncture. In Montgomery, unlike the instant case, all of the medical experts agreed the venipuncture caused median nerve dysfunction. The only disagreement was with regard to how the venipuncture caused the damage. Further, in Montgomery there was no affirmative evidence there was no negligence. In the instant case there was affirmative evidence there was no negligence.
In order to apply res ipsa loquitur, the Montgomery court explained at 319:
The principle of res ipsa loquitur is a rule of circumstantial evidence that infers negligence on the part of defendants because the facts of the case indicate that the negligence of the defendant is the probable cause of the accident, in the absence of other equally probable explanations offered by credible witnesses. Boudreaux v. American Insurance Co., 262 La. 721, 763-64, 264 So.2d 621, 636 (1972). The doctrine allows an inference of negligence to arise from the common experience of the factfinder that such accidents normally do not occur in the absence of negligence.
Additionally, the doctrine does not dispense with the rule that negligence must be proved. It simply gives the plaintiff the right to place on the scales, “along with proof of the accident and enough of the attending circumstances to invoke the rule, an inference of negligence” sufficient to shift the burden of proof. Id.; Larkin v. State Farm Mutual Automobile Insurance Co., 233 La. 544, 551, 97 So.2d 389, 391 (1957).
The doctrine applies only when the facts of the controversy “suggest negligence of the defendant, rather than some other factor, as the most plausible explanation of the accident. Application of the principle is defeated if an inference that the accident was due to a cause other than defendant’s negligence could be drawn as reasonably as one that it was due to his negligence.” Walker v. Union Oil Mill, Inc., 369 So.2d 1043, 1048 (La.1979); Boudreaux v. American Insurance Co., 262 La. 721, 765, 264 So.2d 621, 636 (1972). The doctrine does not apply if direct evidence sufficiently explains the injury. Walker v. Union Oil Mill, Inc., supra at 1048; King v. King, 253 La. 270, 278, 217 So.2d 395, 397 (1968).
Here, there was testimony from Dr. Ruth Frye-Harper that Picou did not have an *224 infection from the venipuncture. She also testified that his problems with his elbow were in a different location from the veni-puncture and were unrelated.
The doctrine of res ipsa loquitur is to be sparingly applied. Day v. National U.S. Radiator Corp., 241 La. 288, 128 So.2d 660 (La.1961). In Day the court held at 128 So.2d 665:
This doctrine is a qualification of the general rule that negligence is not to be presumed but must always be affirmatively proved, and therefore should be sparingly applied, and only in exceptional cases where the demands of justice make that application essential.
| gin Smith v. State Through Dept. of Health and Human Resources Admin., 523 So.2d 815 (La.1988) the court explained at 823 that it could not be said that a heart attack is the type of problem which does not normally occur without negligence. There was evidence in the record to that effect. Here, Dr. Frye-Harper testified that Picou’s elbow problem could occur absent negligence, through exertion. The Smith court held that because it could not be said that the only reasonable explanation of the heart attack was the defendant’s negligence, causation cannot be presumed. Likewise, there was evidence in the instant case that an inflammation and elbow problem are not the types of problems which do not normally occur without negligence. It cannot be said in the instant case that the only reasonable explanation of the problem is negligence.
In Larkin v. State Farm Mut. Auto. Ins. Co., 233 La. 544, 97 So.2d 389, 392 (La.1957) the court held that the doctrine was not applicable when witnesses were present and there was direct testimony as to causation. It explained:
Nor is a resort to res ipsa loquitur warranted in cases where ... the opposing parties or their witnesses are present and direct testimony as to the cause of the accident is available ...
Dr. Frye-Harper, the first physician to examine Picou after the incident, testified Picou did not develop cellulitis from the veni-puncture. She was the only physician to undertake an objective test to rule out an infection. She took a blood count which she described as normal. Although Picou testified Dr. Frye-Harper told him he had a low blood count and an infection, those statements were denied by Dr. Frye-Harper. Additionally, her medical report on that date only states that cellulitis should be ruled out.
Drs. Puente and Meyer both admitted they saw no signs of an infection. Dr. Puente felt there was an infection from the redness in the area. Dr. Frye-Harper testified that the redness indicated an inflammatory process and not an infection. She also stated that the area of redness about the elbow was unrelated to the venipuncture. She distinguished the problems Picou was having as originating from two different sites. On the one hand, she viewed the bruising over the area of the venipuncture as a normal sequela of that procedure. She viewed the area of redness about the elbow to be attributed to a different cause. She stated exertion could cause the subsequent problem of epicondyli-tis or a condition similar to tennis elbow in lathe elbow. Dr. Frye-Harper explained she was only prescribing an antibiotic should Pi-cou be developing cellulitis. However, she clearly felt that if he were to develop celluli-tis it would not be due to the venipuncture. She described that condition as virulent and one which rapidly progresses in a matter of hours. She stated that since an emergency room physician does not follow a patient, more aggressive measures are taken in order to guard against the patient’s not following-up with care by another physician. She prescribed an antibiotic based on this general method of practice by an emergency room physician.
The trial judge evidently attached greater weight to the testimony of Dr. Frye-Harper. We find no manifest error. In Mistich v. Volkswagen of Germany, Inc., 95-0939 (La.1/29/96) 666 So.2d 1073, 1077-78 the Supreme Court explained:
In our three-tiered judicial system, findings of fact are allocated to the trial courts. It is a well settled principle that an appellate court may not set aside a trial court’s finding of fact unless it is clearly wrong. Where there is conflict in the testimony, *225 reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Where two permissible views of the evidence exist, the factfinder’s choice between them cannot be manifestly wrong. Rosell, supra at 845; Watson v. State Farm Fire & Casualty Ins. Co., 469 So.2d 967 (La.1985); Arceneaux, supra at 1333. Where the factfinder’s conclusions are based on determinations regarding credibility of the witnesses, the manifest error standard demands great deference to the trier of fact, because only the trier of fact can be aware of the variations in demean- or and tone of voice that bear so heavily on the listener’s understanding and belief in what is said. Rosell, supra at 844. The reviewing court must alivays keep in mind that if a trier of fact’s findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even if convinced that if it had been sitting as trier of fact, it ivould have weighed the evidence differently. Stobart v. State, Through DOTD, 617 So.2d 880 (La.1993); Housley v. Cerise, 579 So.2d 973 (La.1991); Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106 (La.1990).
For the reviewing court, the issue to be resolved is not whether the trier of fact was wrong but whether the factfinder’s conclusions were reasonable. Stobart, supra at 883; Theriot v. Lasseigne, 640 So.2d 1305 (La.1994). Moreover, where the testimony of expert witnesses differ, it is the responsibility of the trier of fact to determine which evidence is most credible. Sistler, supra, at 1111; Theriot, supra at 1313. This language places the responsibility of determining which expert was more credible on the trial judge ...
| ipThis court announced a two-part test for reversal of a factfinder’s determination:
(1) The appellate court must first find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
(2) the appellate court must further determine that the record establishes that the factfinder is clearly wrong (manifestly erroneous).
Stobart, supra at 882; Mart v. Hill, 505 So.2d 1120 (La.1987). [emphasis added.]
We find the trial judge’s conclusion there was no negligence on the part of Equifax to be reasonable in light of the entire record.
Accordingly, for the reasons stated, the judgment is affirmed at appellants’ cost.
AFFIRMED.