# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## CA 05-353

**LAWRENCE MENARD AND PATRICIA MENARD**

**VERSUS**

**MICHAEL R. HOLLAND, M.D.**

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
THIRTY-FIRST JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON DAVIS, NO. C-73-99
HONORABLE WENDELL R. MILLER, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**BILLY HOWARD EZELL**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Billy Howard Ezell, and J. David Painter, Judges.

**AFFIRMED.**

**Joseph Texada Dalrymple**
**Rivers, Beck, Dalrymple**
**P. O. Drawer 12850**
**Alexandria, LA 71315**
**(318) 445-6581**
**Counsel for Plaintiffs/Appellants:**
**Lawrence Menard**
**Patricia Menard**

**James R. Shelton**
**Durio, McGoffin & Stagg**
**P. O. Box 51308**
**Lafayette, LA 70505-1308**
**(337) 233-0300**
**Counsel for Defendant/Appellee:**
**Michael R. Holland, M.D.**

**EZELL, JUDGE**.

Lawrence Menard and his wife, Patricia, filed this medical malpractice claim against Dr. Michael Holland alleging that Dr. Holland's substandard care in the operating room during Mr. Menard's cervical procedure caused him injury. Immediately after surgery Mr. Menard experienced extreme pain and swelling in his left arm. It was later determined that Mr. Menard was suffering from a condition in his left arm known as reflex sympathetic dystrophy (RSD). The case was tried before a jury which found that Dr. Holland's care of Mr. Menard was appropriate. The Menards appealed.

## FACTS

Mr. Menard worked offshore as a cook and awoke one night with a pain in his neck and right arm that continued to worsen. Mr. Menard was referred to Dr. Holland by his family doctor, Dr. Richard McGregor, after an MRI revealed that he had a large posterior disc herniation at C6-7 with extrusion of disc material and significant cord compression. A posterior lateral C5-6 disc herniation with obliteration of the epidural fat was also observed. Due to the degree of cord compression, Dr. Holland recommended a two-level discectomy, corpectomy, illiac crest bone graft, and fusion.

On October 11, 1996, the procedures were performed. In the recovery room, it was noted that Mr. Menard experienced relief from his right-sided pain. However, he was now experiencing significant left upper extremity pain, swelling, and burning sensations. He was evaluated closely and appeared to have RSD. "RSD" is defined by 18 TABER'S CYCLOPEDIC MEDICAL DICTIONARY 1651 (1997), as "[a]n excessive or abnormal response of the sympathetic nervous system following injury to the face, shoulder, or extremity."

1

Concern that there might be a residual or new compression prompted a CT myelogram which indicated a possible compression on the left of the C5-6 level. On October 13, 1996, Mr. Menard was taken back to surgery for further decompression, which consisted of evacuation of a hematoma in the spinal canal as well as excision of his posterior longitudinal ligament and trimming of the iliac crest bone graft.

Mr. Menard continued to experience swelling, pain, and numbness in his left arm while Dr. Holland continued evaluating him. Different therapies were attempted to try to improve the condition in the left arm, including physical therapy and stellate ganglion blocks, which produced relief for a short period of time.

After EMG and nerve conduction studies indicated median and ulnar nerve abnormalities in the forearm, Mr. Menard was sent to Dr. Robert Tiel for an evaluation Dr. Tiel performed a sympathectomy on April 22, 1997. A sympathectomy is a procedure performed by a neurosurgeon in which an attempt is made to cut the sympathetic nerves to provide relief of the pain. This did relieve some of Mr. Menard's pain, but he continues to experience pain and problems in his left arm today.

Dr. Holland continued treating Mr. Menard until a claim was filed by the Menards in October 1997. The case was tried before a jury in August 2004. The jury returned a unanimous verdict finding that Dr. Holland's treatment of Mr. Menard was appropriate. The Menards assert that the trial court committed three legal errors which affected the jury's verdict. They claim that the trial court erred in failing to give a *res ipsa loquitur* jury instruction, in failing to strike four jurors for cause, and in failing to delete a written narrative by Dr. Holland from the medical records. The Menard's also claim that the jury's verdict was clearly wrong because the evidence in their favor was so overwhelming.

2

# *RES IPSA LOQUITUR* JURY INSTRUCTION

In *Cangelosi v. Our Lady of the Lake Regional Medical Center*, 564 So.2d 654, 660 (La.1989), the supreme court reiterated the analysis of the doctrine of *res ipsa loquitur* as it expressed in *Montgomery v. Opelousas General Hospital*, 540 So.2d 312 (La.1989)(citations omitted):

> The principle of res ipsa loquitur is a rule of circumstantial evidence that infers negligence on the part of defendants because the facts of the case indicate that the negligence of the defendant is the probable cause of the accident, in the absence of other equally probable explanations offered by credible witnesses. The doctrine allows an inference of negligence to arise from the common experience of the factfinder that such accidents normally do not occur in the absence of negligence.

> Additionally, the doctrine does not dispense with the rule that negligence must be proved. It simply gives the plaintiff the right to place on the scales, "along with proof of the accident and enough of the attending circumstances to invoke the rule, an inference of negligence" sufficient to shift the burden of proof.

> The doctrine applies only when the facts of the controversy "suggest negligence of the defendant, rather than some other factor, as the most plausible explanation of the accident. Application of the principle is defeated if an inference that the accident was due to a cause other than defendant's negligence could be drawn as reasonably as one that it was due to his negligence." The doctrine does not apply if direct evidence sufficiently explains the injury.

The Menards requested that the judge give the jury a *res ipsa loquitur* jury instruction contending that there was no doubt that RSD in Mr. Menard's left arm was caused by an agency or instrumentality within the actual or constructive control of Dr. Holland during the cervical spinal procedure. Specifically, the Menards argued that Dr. Holland's placement of Mr. Menard's hands beneath his buttocks caused RSD.

The evidence at trial revealed that RSD is a relatively uncommon syndrome. It most commonly results after trauma to the limb. Many doctors have not even heard of RSD resulting from a spinal procedure. However, the doctors who testified agreed that different events could have caused RSD in Mr. Menard's left arm.

3

Dr. Stuart Phillips, an orthopedic surgeon, testified that there are four possibilities that could have caused RSD in the operating room: (1) placing of the hands partially or fully beneath the buttocks or hips; (2) leaving the elbows unpadded for the duration of the surgical procedure; (3) applying the retractors during the procedure with enough force; and (4) placing the wrist restraints too tightly around the wrists.

Dr. Gaetano Scuderi, also an orthopedic surgeon, agreed that the retractor could have caused injury to the sympathetic plexus. He also agreed that the placement of Mr. Menard's arms beneath him or the restraints on the wrists could have generated RSD. It was his opinion that these causes did not provide a safe operating environment. He opined that the most likely cause of RSD in this case was the placement of Mr. Menard's arms underneath him for four to five hours.

Dr. Christopher Cenac, another orthopedic surgeon, agreed that a lot of different things could have caused RSD in Mr. Menard's left arm. He opined that some type of compression from the retractors in the neck could have caused RSD, which is what he thought was the most likely cause of Mr. Menard's condition. He testified that nerve injury is a known complication of the surgical procedure and manipulating the C5-C6 nerves during surgery was not a breach of the standard of care required of Dr. Holland.

Dr. Holland himself testified that everyone agreed that something acute happened, they were just not sure what. Dr. Holland testified that the five-hour procedure went smoothly. Using a model, Dr. Holland demonstrated for the jury how he placed the wrist restraints on Mr. Menard and then placed his hands beneath the hips. Dr. Holland explained that he wrapped the arms with a sheet and the sheet was tucked under the patient. He testified that he did not tuck a patient's arms under the

4

weight of his body. A bump is also placed under the hip to enable him to harvest bone for the graft. Dr. Holland opined that the most likely triggering event occurred in the neck, which though very rare, is a complication of surgery.

Dr. Phillips stated that the sympathetic nerves run right along the side of the spine around C-5 where Dr. Holland was working. Dr. Phillips also testified that many times the cause of RSD is unknown. Dr. Phillips was aware of RSD developing after a spinal surgery but had not heard of it following cervical surgery. Dr. Phillips did state that it was easy to understand how the sympathetic nerves could be injured in this case because the sympathetic nerves are in the area of the surgery.

While we agree with the Menards that many obvious causes of RSD would necessarily be due to Dr. Holland's negligence, there is still the possibility that this was a complication of surgery not caused by any negligence on the part of Dr. Holland. There was evidence that Mr. Menard may be one of the unfortunate people who suffered a very rare complication of his cervical spine surgery. We cannot say that the trial court erred in failing to give a *res ipsa loquitur* instruction to the jury.

We also find support in the record for the jury's finding that Dr. Holland did not breach the standard of care. Therefore, we find no manifest error in the jury's verdict.

**CHALLENGE FOR CAUSE TO JURORS**

In this assignment of error, the Menards claim the trial court erred in failing to grant their challenges for cause on four occasions. Their basis for challenging three of the jurors is their relationship with Dr. Holland because either the juror or a family member of the juror had been treated by Dr. Holland. The Menards challenge the fourth juror for his willingness to weigh the evidence by the preponderance of the evidence standard.

5

"In civil cases, criminal jurisprudence on challenges for cause of prospective jurors may be considered." *Hall v. Brookshire Bros., Ltd.*, 01-1506, p. 9 (La.App. 3 Cir. 8/21/02), 831 So.2d 1010, 1019, *writs granted*, 02-2404, 02-2421 (La. 11/27/02), 831 So.2d 285, *affirmed*, 02-2404, 02-2421 (La. 6/27/03), 848 So.2d 559. In order to establish that there has been an error warranting reversal, a party must show, "(1) the erroneous denial of a challenge for cause; and (2) the use of all of his peremptory challenges." *State v. Jones*, 03-3542, p. 10 (La. 10/19/04), 884 So.2d 582, 589, *quoting State v. Robertson*, 92-2660 (La. 1/14/94), 630 So.2d 1278.

As indicated by Dr. Holland in his brief, the Menards still had one remaining peremptory challenge, having exercised only five peremptory challenges. A review of the voir dire of the jury reveals that the trial court allowed the parties to back strike any jurors once twelve jurors had been selected. At that time the Menards had four peremptory challenges left. Once finished with the back strikes, the Menards still had one remaining peremptory challenge. Therefore, we find that we need not reach the issue of whether there was an erroneous denial of the Menards' challenge for cause.

However, we do note the fact that a potential juror had a former or ongoing relationship with the defendant doctor does not automatically subject that juror to exclusion from the jury for cause. *Cobb v. Kleinpeter*, 95-271 (La.App. 3 Cir. 10/4/95), 663 So.2d 236, *writ denied*, 95-2683 (La. 1/12/96), 666 So.2d 323. A trial court's determination that a potential juror can be fair and impartial is subject to the clear abuse standard of discretion. *Id*. Our review of the transcript of the voir dire of the jurors complained about reveals that any treatment by Dr. Holland was completed months, and even years, before trial. All jurors stated, without hesitation, that they could be fair and impartial. Additionally, we agree with the trial court's assessment that the juror who was uncertain about his ability to weigh the evidence

6

by the preponderance of the evidence standard had been rehabilitated. The trial court found that upon further questioning, the juror was sufficiently rehabilitated. We find no abuse of discretion in that finding.

### DR. HOLLAND'S MEDICAL RECORDS

The Menards' final assignment of error concerns the trial court's failure to delete a note from Dr. Holland's chart. They wanted to omit a narrative by Dr. Holland concerning an office visit with the Menards on October 30, 1997. They claim the note was irrelevant and prejudicial because it discusses the fact that Menards' attorney was making them file suit and they do not want to because they do not think that Dr. Holland did anything wrong.

The trial court observed that the document was a note made by Dr. Holland himself concerning a conversation with the Menards at one of the office visits. The court reasoned that even if the document was excluded, Dr. Holland could still be questioned about his conversation with the Menards that was referred to in the document.

A trial court's decision on the admissibility of evidence is subject to the abuse of discretion standard. *Whitehead v. Kansas City S. Ry. Co.*, 99-896 (La.App. 3 Cir. 12/22/99), 758 So.2d 211, *writ denied*, 00-209 (La. 4/7/00), 759 So.2d 767. Louisiana Revised Statutes 13:3714 provides for the introduction of medical records when the records have been certified in accordance with the statute by the medical provider, thereby creating an exception to the hearsay rule. The purpose is to save a litigant the difficulty and expense of having to produce every person who assisted in treatment as a witness. However, the first circuit in *Kenney v. Cooper*, 444 So.2d 211 (La.App. 1 Cir. 1983), noted that hearsay and irrelevancy are still independent bases for the exclusion of evidence when La.R.S. 13:3714 is utilized. *Also see*

7

*Vaughn v. Progressive Sec. Ins. Co.*, 03-1105 (La.App. 3 Cir. 3/2/05), 896 So.2d 1207, *writ not considered*, 05-855 (La. 5/13/05), 902 So.2d 1004, and *Mendoza v. Mashburn*, 99-499, 99-500 (La.App. 5 Cir. 11/10/99), 747 So.2d 1159, *writ denied*, 00-37,00-40, 00-43, (La. 2/18/00), 754 So.2d 957, 976.

While we may find that the note could be considered prejudicial to the Menards in indicating their unwillingness to file suit, we find that the admittance of the document did not taint the verdict. *See Vaughn*, 896 So.2d 1207. On direct examination by his own attorney, Mr. Menard admitted that he hesitated about filing suit against Dr. Holland because he is a good doctor. He indicated that he was unable to work and about to lose his home so he filed suit. We find that the admittance of this document did no more damage than Mr. Menard's own testimony at the trial itself. Furthermore, as we have indicated, there was sufficient evidence for the jury's verdict in favor of Dr. Holland.

Therefore, for the reasons expressed in this opinion, the judgment of the trial court is affirmed. Costs of this appeal are assessed to Lawrence and Patricia Menard.

**AFFIRMED.**

8